**Olive B. DeWITT, Plaintiff,**

v.

**Joel B. LIEBERMAN, New York State Housing Finance Agency, and the Parks Group, Defendants.**

**No. 97 CIV. 4651(SAS).**

United States District Court, S.D. New York.

Jan. 13, 1999.

Olive DeWitt, Bronx, pro se.

Jeffrey D. Ullman, Ullman, Furhman, Platt & Koy, Morristown, NJ, for Defendant Joel Lieberman.

Lois M. Traub, Hitsman, Hoffman & O'Reilly, Elmsford, for Defendant New York State Housing Finance Agency.

Andrew M. Bernstein, Jacobowitz, Garfinkel & Lesman, New York, for Defendant The Parks Group, Inc.

## OPINION & ORDER

SCHEINDLIN, District Judge.

This is a *pro se* action for sexual harassment and employment discrimination brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, the New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code, § 8-107. The federal claims against defendant New York State Housing Finance Agency ("HFA") consist of quid pro quo and hostile work environment. The only federal claim against defendant The Parks Group, Inc. ("Parks") is one of retaliation. There are no federal claims against defendant Joel B. Lieberman ("Lieberman").[1] All defendants are also being sued under the HRL and the NYCHRL. Defendants have moved separately for summary judgment on all claims. For the reasons set forth below, defendants' motions are granted in part and denied in part.

## I. Factual Background

Olive B. DeWitt ("plaintiff" or "DeWitt") responded to an advertisement placed by Parks in the New York Times on Sunday August 20, 1995 for a permanent secretarial position. Affidavit in Support of Motion for Summary Judgment, sworn to by Jeffrey D. Ullman, attorney for defendant Lieberman, on October 30, 1998 ("Ullman. Aff."), Exh. D (Statement by Marie Parks). She was interviewed by Marie Parks, the president of Parks, and her typing and word processing skills were then tested. *Id.*, Exh. C at 32–34 (Deposition of Marie Parks). Although plaintiff's abilities were not adequate for the advertised position, she appeared qualified for other temporary positions. *Id.* at 5, 8.

In early September 1995, DeWitt was assigned as a temporary legal secretary to defendant HFA in response to Lieberman's request for a replacement for another temporary worker who was going on vacation. *Id.*, Exh. D. According to Marie Parks, she arranged the assignment with DeWitt explaining to her that it would be for approximately two weeks. *Id.; see also* Exh. C at 52–53. Although Ms. Parks discussed with plaintiff the possibility that other positions of a more permanent nature might become available at HFA in the future, she clearly informed plaintiff that the only position she was presently able to offer her consisted of a two week assignment that would end on September 22, 1995, when the temporary worker she was replacing would return from vacation. *Id.*

Plaintiff's assignment at HFA's legal department began on September 11, 1995. Ullman Aff., Exh. A at 57 (Deposition of Olive DeWitt). Plaintiff was informed that Lieberman would be providing her with her work assignments. *Id.* at 58. Plaintiff was also told of the department's structure and hierarchy. Affirmation in Support of Motion for Summary Judgment, sworn to by Lois M. Traub, attorney for HFA, on October 30, 1998, ("Traub Aff.") Exh. A at 82 (Deposition of Olive DeWitt). Lieberman was an Assistant Counsel in the department; his immediate supervisor was Joy Willig ("Willig"), an Associate Counsel; Willig reported to Michael White, a Deputy Counsel; who, in turn, reported to HFA's General Counsel, Manuel Mendez. Affirmation in Support of Summary Judgment, sworn to by Michael D. White, HFA's Deputy Counsel, on October 29, 1998 ("White Aff."), ¶¶ 3–4. During plaintiff's initial orientation on September 11, 1995, Willig informed her that she was to "report any problems [she] had to Caroline Telfer [Mingo]," Willig's secretary. Ullman Aff, Exh. B at M–7 (Temporary Employees Basic Guidelines for Legal Division Procedures). As plaintiff testified at deposition:

personally liable under Title VII, *see infra* Section II, D.

---

1. By Order dated September 8, 1998, I dismissed plaintiff's Title VII claims against Lieberman as individuals cannot be found

Q: The first day that you started your assignment, who did you report to?

A: I was told to report to Caroline, T-e-l-f-e-r I believe is her name. If I had any problems, I was to tell her. If I needed anything, I was to tell her.

Q: Who told you that?

A: Joy Willig. She said, "I am Mr. Lieberman's supervisor and I am assigning Caroline Telfer to you as your supervisor. If you need anything, you are to go to her. If you have any problems, you are to go to her."

Ullman Aff. Exh. A at 81–82.

Plaintiff alleges that Lieberman sexually harassed her in a series of incidents occurring between Tuesday, September 12, 1995 and Tuesday, September 19, 1995. DeWitt alleges that on September 13, 1995, Lieberman offered her a banana in an offensive manner but she nonetheless accepted and ate a piece of it. Traub Aff., Exh. J at 3 (Report on Investigation Respecting Allegations Made by Olive DeWitt Concerning Conduct of Joel B. Lieberman, dated October 19, 1995); *see also* Supplemental Affirmation in Support of Reply Memorandum for Summary Judgement, sworn to by Lois M. Traub on December 2, 1998 ("Traub Supp. Aff."), Exh. A at 534–35 (Deposition of Olive DeWitt). Although various accounts of an incident involving plaintiff's jacket have been provided by plaintiff, the most egregious version has Lieberman pestering DeWitt for several days, starting on September 12, 1995, to remove her jacket saying something to the effect, "If I could see your breasts then I could put to rest certain feelings I have." Traub Aff., Exh. J at 4; *see also* Traub Supp. Aff. Exh. A at 534. Then there is the private meeting held in Lieberman's office on September 14, 1995 with Lieberman and DeWitt. Traub Aff, Exh. J at 4.

Plaintiff alleges that at that meeting, which lasted over two hours, there was further talk about her not wearing her jacket and about her breasts. *Id.* In addition, Lieberman allegedly raised the subject of a relationship with DeWitt stating that she could work at HFA permanently if their relationship could "ripen." *Id.* at 5; *see also* Traub Aff., Exh. K at 2 (Supplemental Report on Investigation Respecting Allegations Made by Olive DeWitt Concerning Conduct of Joel B. Lieberman, dated November 15, 1996); Ullman Aff., Exh. E at 2 (Exit Questionnaire of Parks Austrian Temporaries, Inc., an affiliate of Parks).[2] According to plaintiff, at one point during the meeting Lieberman placed his hands in his pockets and touched his penis. Traub Aff., Exh. J at 5. While grabbing his groin area and lunging it forward, Lieberman allegedly stated, "I am overwhelmed by your sensuality, if I could just see the outline of your breasts, I could put these feelings to rest, . . ." Affidavit in Opposition to the Lieberman Motion for Summary Judgment, sworn to by Olive B. DeWitt on November 23, 1998 ("DeWitt Aff.—Lieberman"), Exh. 6 at 4 (Misdemeanor Criminal Complaint filed by Olive DeWitt). DeWitt also alleges that between September 15, 1995 and September 19, 1995, Lieberman called her at home to pursue a relationship or affair with her stating that he wanted to come over to her house. *Id.*

Plaintiff also alleges more serious incidents of sexual abuse. On September 15, 1995, DeWitt claims that in a back stairwell at HFA, Lieberman grabbed at her blouse causing his right hand to reach under her blouse and touch her left breast. *Id.* at 3. Again, on September 19, 1995, while inside Lieberman's car, plaintiff observed Lieberman grab at her blouse in

---

**2.** Lieberman did not have "authority for the hiring, termination, discipline, promotion, pay raises, benefits, transfer, suspension, layoff, evaluation, or establishing other terms and conditions of employment of any personnel, including secretaries, in the Agency legal department. Mr. Lieberman did not have au-

thority over regular, permanent secretarial staff or secretarial support temporary workers assigned to the Agency legal department from temporary agencies." Affirmation in Support of Summary Judgment, sworn to by Michael D. White, HFA's Deputy Counsel, on October 29, 1998 ("White Aff."), ¶ 14.

the bra area trying to undo a button and causing his right hand to touch her left breast. *Id.* That same day, about a half hour later, while Lieberman's car was parked under the 59th Street bridge in Manhattan, Lieberman again allegedly tried to undo a button and in so doing touched DeWitt's left breast. *Id.* at 3–4. While still parked at that location, Lieberman allegedly grabbed plaintiff's left hand and pushed it down on his pants over his penis while putting pressure on and refusing to release plaintiff's hand. *Id.* at 4. Needless to say, Lieberman denies these latter allegations. Traub Aff., Exh. K at 3–4.

Despite these allegedly harrowing experiences, plaintiff made no complaint to anyone in a supervisory/managerial position at HFA until well after the end of her assignment. Ullman Aff, Exh. A at 741. Although plaintiff spoke to Ms. Parks nearly twenty times during the first several days of her assignment, she never once claimed that Lieberman had harassed her or behaved in any way that was even remotely inappropriate or sexually aggressive. *Id.* at 712–13. According to Ms. Parks, plaintiff expressed great satisfaction with the assignment and Lieberman. Ullman Aff., Exh. C at 40. Plaintiff alleges that on September 12, 1995, she told Caroline Telfer Mingo that Lieberman was "fresh" because he suggested that she might be more comfortable if she removed her suit jacket. Ullman Aff., Exh. A at 506–07. Plaintiff claims that Ms. Mingo told her, "That's what he does. Don't pay him any mind." *Id.*

Plaintiff alleges that she reported Lieberman's behavior with regard to her jacket to Pat Wyatt, secretary to General Counsel Manuel Mendez, in an attempt to speak to either Mr. Mendez or Mr. White on the last day of her employment with HFA. Traub Aff., Exh. J at 7. Ms. Wyatt reportedly told DeWitt that Mr. Mendez could not see her that day. *Id.* Plaintiff interpreted Ms. Wyatt's response as somehow protecting the General Counsel. *Id.* Ms. Wyatt claims to have suggested that plaintiff wait but despite this suggestion plaintiff left at 5:00 p.m. without speaking to anyone. *Id.* Plaintiff further states that she approached a member of HFA's personnel department, Marlene Robinson, Ullman Aff., Exh. A at 440, during the second week of her assignment. She claims that she refrained from making a full report of her ordeal with Lieberman because she somehow "sensed" that Ms. Robinson would have been indifferent to her plight. *Id.* at 126–29. Instead, plaintiff merely inquired of Ms. Robinson as to whether there were openings at HFA to which she might transfer at the conclusion of her assignment. *Id.* at 127 or 436–40. Informed that she would have to prepare and submit an application for employment, plaintiff obtained the requisite forms but said nothing about being victimized by Lieberman.[3] *Id.* at 127 or 436–40.

It was only after plaintiff's assignment at HFA was over that she first complained in a meaningful way about Lieberman's behavior. DeWitt initially made these allegations to Ms. Parks when she appeared at Parks' office to pick up her final pay-

---

**3.** HFA is subject to the New York State Civil Service Law. Affidavit in Support of Summary Judgment, sworn to by Michael Dalley, HFA's personnel director, on October 29, 1998 ("Dalley Aff."), ¶ 3. As such, permanent appointment to a competitive class civil service position, such as legal secretary, "requires that the applicant take and pass a civil service examination; be placed on an eligibility list; be reachable if selected by the Agency President; and successfully serve a probationary period of one year." *Id.* Plaintiff admits that Ms. Robinson directed her to read the required employment form and follow the instructions. Traub Aff., Exh. A at 748. Plaintiff also admits that she "looked at it and read it and it said something about a test or whatever, but [she] didn't follow up on it." *Id.* Regarding her employment application, plaintiff concedes that there was a procedure but that she did not complete it. *Id.* at 781. These admissions establish that DeWitt was aware of most, if not all, of the procedures required to obtain a permanent civil service position.

check. On an exit questionnaire, plaintiff wrote that her supervisor had been unprofessional and explained this comment by stating that Lieberman: "was very fresh and demanded that I open my jacket so that he could see my breast outline. I flatly refused four times over a five day period... He told me I could stay on the job indefinitely if our relationship rippened [sic]. He made several off-beat comments." Ullman Aff., Exh. E at 1–2. According to plaintiff, Ms. Parks requested that she discontinue any complaint against Lieberman and encouraged her to pursue other work. Affidavit in Opposition to the Parks Group Motion for Summary Judgment, sworn to by Olive B. DeWitt November 23, 1998 ("DeWitt Aff.—Parks"), ¶¶ 8, 26.

Plaintiff alleges that Ms. Parks intentionally refused to place her in another assignment in the two weeks following her assignment at HFA because of her intention of bringing a criminal proceeding against Lieberman.[4] Affidavit in Support of Motion for Summary Judgment, sworn to by Andrew Bernstein, attorney for Parks, on October 30, 1998 ("Bernstein Aff."), Exh. D at 874. However, plaintiff has admitted that within that two-week period, she sought and obtained employment with another agency. Id. Plaintiff has also described specific efforts by Ms. Parks within that two-week period that simply did not result in an assignment. Id. at 870–71. There were also discussions concerning a tutorial software that would have provided plaintiff with a particular type of training. Id. at 871–72.

On September 27, 1995, Michael Dalley, HFA's personnel director, received a voicemail message from plaintiff which he responded to immediately. Dalley Aff., ¶ 21. In his conversation with plaintiff, she made a brief statement characterizing Lieberman's request to open her jacket as an act of sexual aggression. Id. An investigation of plaintiff's allegations commenced on September 29, 1995, the first day that Lieberman, Mr. White and Mr. Dalley could meet. Id. at ¶ 22. Mr. White and Mr. Dalley interviewed Lieberman, HFA employees and non-employees, including DeWitt, on two occasions to ensure the veracity and completeness of their statements. Id. at ¶ 23. Mr. Dalley then submitted a comprehensive written report dated October 19, 1995 to Stephen J. Hunt, HFA's president, concerning the allegations leveled at Lieberman by DeWitt. Id. at ¶ 24; see also Traub Aff., Exh. J. That report addressed the following four incidents of alleged harassment: the banana offering; the comments about plaintiff's jacket; the extended meeting between Lieberman and DeWitt; and a phone call from Lieberman to DeWitt. Traub Aff., Exh. J at 3–5. Mr. Dalley concluded that upon the facts ascertained by his investigation, no disciplinary action against Lieberman for sexual harassment was warranted. Id. at 9. However, as a result of Dalley's investigation, Lieberman was admonished for his unprofessional conduct as follows:

1. The unprofessional conduct on your part for which you received admonishment from the counsel in October of 1995 consisted of having spent an extended period of time during working hours in your office with a temporary legal secretary with the door closed and discussing the possibility of the two of you having a relationship.

2. No further disciplinary action was taken.

DeWitt Aff.—Lieberman, Exh. 4.

Then, on November 28, 1995, Dalley received from the Equal Employment Opportunity Commission ("EEOC") notice and a copy of charges DeWitt had filed with the EEOC on November 21, 1995. Dalley Aff., ¶ 25. The new charges included allegations that: Lieberman physically touched plaintiff in a stairwell in the HFA

---

4. Ms. Parks has stated that she first learned of a criminal proceeding against Lieberman after May 6, 1996 when she received a letter from an Assistant District Attorney. Id., Exh. C, ¶ 14.

building; that Lieberman offered plaintiff a ride to work; that Lieberman took plaintiff in his car to an isolated area in the South Bronx; that Lieberman took plaintiff under the 59th Street Bridge where he forced her to touch his penis; and that plaintiff had to consent to Lieberman's sexual appetites to keep her job with HFA. *Id.* Dalley then conducted a second investigation in response to these charges which culminated with a comprehensive supplemental report.[5] *Id.* at ¶ 26; *see also* Traub Aff., Exh. K. Again, he found no additional facts to support a finding of sexual harassment. Traub. Aff, Exh. K at 4. Although no disciplinary action was recommended, Dalley did suggest that HFA's Counsel reinforce with Lieberman that if he had actually engaged in the conduct alleged by DeWitt, "it might possibly constitute sexual harassment and would be grounds for his dismissal." *Id.* at 4–5. As Lieberman participated in HFA's sexual harassment prevention training seminar in November of 1994, Dalley saw no need for him to repeat it. *Id.* at 5.

HFA has maintained a Sexual Harassment Policy since 1981 as well as detailed discrimination complaint procedures since approximately 1984. Dalley Aff., ¶ 16; *see also* Traub Aff., Exh. I. A copy of the Sexual Harassment Policy and accompanying complaint procedures is appended to this Opinion as Exhibit A. The Sexual Harassment Policy is maintained in the employee handbook in HFA's personnel office and is readily available to all individuals. Dalley Aff., ¶ 17. It was in effect in September 1995. *Id.*, ¶ 16. The complaint procedures require that complaints of harassment be investigated by the Personnel Director. *Id.*, ¶ 18. Following the investigation, a detailed report of the sexual

harassment complaint must be prepared and must include recommendations and findings. *Id.* A report based on the investigation is required to be issued within sixty days of the date in which a complaint is made. *Id.* HFA also engages in an anti-sexual harassment training program. *Id.*, ¶ 19. In November 1994, the Center for Women in Government conducted three days of anti-sexual harassment training which every HFA employee was required to attend. *Id.* It is anticipated that formal anti-sexual harassment training will be repeated for all HFA employees in 1999. *Id.*

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment applies no less to Title VII cases and "is still fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61–62 (2d Cir.1998) (citations omitted).

On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). A fact is material if it might affect the outcome of the suit. *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d

---

**5.** Plaintiff also filed a police complaint against Lieberman alleging sexual harassment and abuse. *See* DeWitt Aff.—Lieberman, Exh. 6. Following a thorough investigation, the District Attorney moved to dismiss the complaint upon the ground that the People could not prove a case of sexual harassment beyond

a reasonable doubt, Ullman Aff., Exh. G, which the court granted. *Id.* These charges were also the subject of a complaint against Lieberman filed with the Departmental Disciplinary Committee of the First Department. Traub Aff., Exh. K, at 2.

Cir.1998). A district court must discern whether there are any issues of material fact but not decide them. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994). In determining whether there are such issues, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved and all reasonable inferences drawn against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Tomka v. Seiler*, 66 F.3d 1295, 1304 (2d Cir.1995). Summary judgment is inappropriate if there is any evidence in the record from which a jury could draw a reasonable inference in favor of the nonmoving party on a material fact. *Catanzaro*, 140 F.3d at 93.

## B. Claims Against HFA

### 1. *Quid Pro Quo*

■ Before proceeding to the substantive aspects of plaintiff's claims, two preliminary matters must be addressed: (1) who is plaintiff's employer; and (2) Lieberman's status as a supervisor. With regard to the first issue, HFA and Parks go to great lengths in disavowing an employment relationship with plaintiff. HFA points to the fact that plaintiff was paid by Parks and Parks points to the fact that HFA controlled the conditions of plaintiff's employment. However, it is this precise bifurcation that has lead courts to a finding of "joint employment." *See, e.g., Serrano v. 900 5th Avenue Corp.*, 4 F.Supp.2d 315, 316–17 (S.D.N.Y.1998) (Title VII definition of employer is " 'sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether the party may technically be described as an 'employer' ... at common law' ") (quoting *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982), *vacated on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983)); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 611 F.Supp. 344 (S.D.N.Y.1984), *aff'd without opinion*, 770 F.2d 157 (2d Cir.1985); *King v. Booz–Allen & Hamilton Inc.*, 83 Civ. 7420, 1987 WL 11546 (S.D.N.Y. May 21, 1987). In *Amarnare*, the plaintiff was a temporary worker who was paid by her temporary employment agency but whose work hours, work place and work assignments as well as hiring, firing and supervision were controlled by the employment agency's client, Merrill Lynch. 611 F.Supp. at 346. There, the court employed the loaned servant doctrine and held that a "person whose salary is paid by one entity while [her] services are engaged on a temporary basis by another is an employee of both entities." *Id.* at 349. Accordingly, for purposes of this motion, both HFA and Parks will be considered plaintiff's employer.

■ The next question is whether Lieberman should be considered plaintiff's supervisor for Title VII purposes. Although it is true that Joy Willig formerly assigned Ms. Mingo as plaintiff's supervisor, plaintiff received her work assignments from Lieberman. Moreover, Lieberman was an attorney at HFA while Ms. Mingo was a secretary. Thus, there is a question of fact as to whether Lieberman exercised authority over DeWitt tantamount to that of a supervisor's authority such that he could be considered her "de facto" supervisor. *See Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, 997 F.Supp. 412, 416 (S.D.N.Y.1998) (whether defendant, who was not plaintiff's nominal supervisor, held the power to alter the terms and conditions of her employment presented a triable issue); *Gostanian v. Bendel*, 96 Civ. 1781, 1997 WL 214966, at *6 (S.D.N.Y. April 25, 1997) (jury could reasonably find that defendant, not plaintiff's official supervisor, exercised de facto authority to affect the terms and conditions of plaintiff's employment through her influence over plaintiff's supervisor); *Thomas v. Medco*, 95 Civ. 8401, 1998 WL 542321, at *10 (S.D.N.Y. Aug.26, 1998) (a quid pro quo claim of harassment can rest on alleged harasser's authority to influence an adverse employment decision, if that influ-

ence is so significant that the harasser may be deemed the de facto decision maker). Drawing all reasonable inferences against the moving party, Lieberman will be treated as plaintiff's supervisor for purposes of this motion.

█ Explicit, or so-called "quid pro quo,"[6] sexual harassment occurs when a supervisor "alters an employee's job conditions or withholds an economic benefit because the employee refuses to submit to sexual demands." *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir.1989) (citations omitted). Accordingly, "to establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that she was subjected to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir. 1994) (citations omitted); *see also Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992) ("employee must establish that she was denied an economic benefit because of gender or because a sexual advance was made by a supervisor . . .").

█ "Because the quid pro quo harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for quid pro quo harassment." *Karibian*, 14 F.3d at 777 (citing *Kotcher*, 957 F.2d at 62). If the supervisor possesses no authority to affect the benefits or privileges of employment, a plaintiff cannot sustain a quid pro quo claim of

sexual harassment. *Gostanian*, 1997 WL 214966 at *6; *see also Bridges v. Eastman Kodak Co.*, 822 F.Supp. 1020, 1028 (S.D.N.Y.1993) ("as a requirement for asserting a quid pro quo claim, a plaintiff must assert that the supervisor named as a defendant was given authority by the employer to alter the terms, conditions and privileges of the plaintiff's employment").

█ Plaintiff has made out a prima facie case of quid pro quo harassment by alleging that Lieberman told plaintiff that he could obtain a permanent position at HFA for her if their relationship was allowed to "ripen." The question, however, is whether Lieberman had the apparent authority[7] to hold out this carrot as liability will not attach " 'where a victim or plaintiff could not have reasonably believed that it was within the supervisor's power to affect the conditions of the plaintiff's job.' " *Savino v. The C.P. Hall Co.*, 988 F.Supp. 1171, 1185 (N.D.Ill.1997) (quoting *Jansen v. Packaging Corp. of America*, 123 F.3d 490, 500 (7th Cir.1997)) (Flaum, J., concurring); *cf. Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (in the unusual case where there is a false impression that the harasser was a supervisor, when in fact he was not, the victim's mistaken conclusion must be a reasonable one).

Here, plaintiff acknowledged that she went to HFA's personnel department during the second week of her assignment and picked up an employment application by which she learned of the civil service requirements for employment. In particular, plaintiff admits that the employment application she read said something about

---

**6.** Although the terms "quid pro quo" and "hostile work environment" are of limited utility according to the Supreme Court, *see Burlington Indus., Inc. v. Ellerth*, 118 S.Ct. 2257, 2264, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), they remain relevant to Title VII litigation as they "illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general . . ." *Id.* at 2265; *see also Ponticelli v. Zurich American Ins. Group*, 96 Civ. 9095, 1998 WL

564012, at *12 (S.D.N.Y. Sept.3, 1998). Accordingly, these terms will continue to be used throughout this Opinion if only for descriptive purposes.

**7.** It is not disputed that Lieberman did not have the actual authority to make hiring and firing decisions of a permanent nature at HFA.

a test. However, plaintiff only learned of these requirements after Lieberman's alleged offer of permanent employment. Whether plaintiff was reasonable in believing that Lieberman had the apparent authority to do what he allegedly promised, *i.e.*, a permanent position, is a question best left for a jury. *See Gutierrez v. Henoch*, 998 F.Supp. 329 (S.D.N.Y.1998) (quid pro quo claim dismissed after a bench trial where evidence conclusively established that defendant had neither real nor apparent supervisory authority). Accordingly, summary judgment is denied as to plaintiff's quid pro quo claim.

### 2. Hostile Environment

■■■ In order to prevail on a hostile work environment claim, a plaintiff must establish two elements: (1) a hostile work environment; and (2) a specific basis for imputing the conduct that created the hostile environment to the employer. *Distasio*, 157 F.3d at 62; *Schwapp*, 118 F.3d at 110. To establish the first element, the plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation marks and citations omitted). In determining whether a given environment is hostile, a court should look to the totality of circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. These factors must be evaluated both subjectively and objectively: a reasonable person would find the environment hostile or abusive and the victim did in fact perceive it to be so. *Id.* at 21–22, 114 S.Ct. 367. In addition, the incidents "must be more than episodic; they must be sufficiently continuous and concerted in order

to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, —— n. 1, 118 S.Ct. 2275, 2283 n. 1, 141 L.Ed.2d 662 (1998).

■■■ Here it can be said that as a matter of law the totality of incidents alleged by DeWitt, including the latter allegations of touching, constitute a hostile work environment. If it were not for these latter, more serious allegations, I would be hard pressed to find the requisite level of abuse. However, as all of plaintiff's allegations must be taken as true, I find that she has met the first element. The question then is on what basis, if any, to impute Lieberman's behavior to HFA.

On June 26, 1998, the Supreme Court handed down the decisions in *Burlington* and *Faragher* which set a new standard for employer liability when the harassment causing the hostile work environment is perpetrated by a supervisor which, for purposes of this motion, Lieberman is assumed to be. Where no adverse tangible employment action is taken (quid pro quo):

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suit-

able to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington*, 524 U.S. at ——, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at —— – ——, 118 S.Ct. at 2292–93.[8]

The *Burlington/Faragher* affirmative defense has been applied and summary judgment granted in several cases. For example, in *Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 491–92 (S.D.N.Y.1998), the court concluded that defendant's antiharassment policy and complaint procedures met the first element of the defense. The court then found the second element to have been satisfied given plaintiff's failure to avail himself of defendant's complaint procedures for fear of repercussions. *Id.* at 493. Regarding plaintiff's failure to complain, the court stated that the "rule is simply that Title VII plaintiffs must at least make reasonable efforts to seek redress for any perceived harassment through the employer before initiating a lawsuit in federal court." *Id.* at 492. Similarly, in *Sconce v. Tandy Corp.*, 9 F.Supp.2d 773, 778 (W.D.Ky.1998), the court held that the defendant could not be liable as a matter of law since once it learned of the allegations from the EEOC

complaint, it conducted an investigation and enforced discipline. In *Sconce*, as in *Fierro*, the plaintiff knew where to report complaints of sexual harassment but decided not to report the harassing conduct at all. *Id.*

Here it is undisputed that HFA had an effective antiharassment policy in place at the time of the alleged incidents. Thus, the first element of the affirmative defense is met. The question then is whether plaintiff acted reasonably in the manner in which she complained to HFA of Lieberman's alleged sexual harassment during her tenure of employment. Plaintiff did in fact complain to two people regarding one incident of harassment, that being the alleged remarks made by Lieberman concerning plaintiff's jacket. On September 12, 1995, plaintiff told her nominal supervisor, Caroline Telfer Mingo, that Lieberman was "fresh" because he asked her to remove her jacket. According to plaintiff, Ms. Mingo summarily dismissed this complaint and took no further action. Then, in the afternoon of September 22, 1995, the last day of plaintiff's two-week assignment at HFA, plaintiff claims to have relayed the jacket incident to Pat Wyatt, secretary to Mr. Mendez, General Counsel, in an attempt to speak to him. Plaintiff alleges that Ms. Wyatt refused her request in an attempt to somehow "protect" Mr. Mendez. Then, on September 27, 1995, five days after the conclusion of her two-week assignment, plaintiff left a voice mail with Michael Dalley, HFA's personnel director, complaining of certain incidents of alleged sexual harassment. An investigation was commenced on September 29, 1995, which resulted in Lieberman's reprimand.

Given these facts, I cannot find, as a matter of law, that plaintiff failed to fulfill her obligation of reasonable care to avoid

---

**8.** The *Burlington* and *Faragher* cases did not address harassment by co-workers and it is has been assumed that existing case law on this subject is still applicable. *See Edwards v. State of Conn., Dep't of Transp.*, 18 F.Supp.2d 168, 177 (D.Conn.1998). Accordingly, when the harassment is attributable to a co-worker and not a supervisor, the employer will not be liable unless "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Karibian*, 14 F.3d at 780 (citations omitted).

harm. Although during her employment at HFA, plaintiff only complained of a less serious incident of harassment, the so-called jacket remarks, she did voice her complaints to two secretaries, one being her nominal supervisor, Caroline Telfer Mingo. It was only after her assignment was over that she called Michael Dalley, HFA's personnel director, on September 27, 1995. In her ensuing conversation with Mr. Dalley, plaintiff failed to apprise him of the more serious allegations of touching by Lieberman, limiting her complaints to the four relatively minor incidents (the jacket remarks, the banana incident, the meeting, and the phone calls). Nonetheless, HFA conducted a timely and thorough investigation of the allegations. Mr. Dalley only learned of the latter, more serious allegations approximately one month later through the EEOC complaint plaintiff filed. Again, HFA initiated a timely and thorough investigation of the allegations.

Given the timing and nature of plaintiff's complaints, whether she failed to notify HFA of Lieberman's sexual harassment in a manner reasonably calculated to put HFA on notice of his misconduct is a question of fact that must be decided by a jury.[9] Reading the facts in a light most favorable to DeWitt, a finding that HFA has met its burden in establishing the second element of the *Burlington/Faragher* defense cannot be made. *See Ponticelli v. Zurich American Ins. Group*, 96 Civ. 9095, 1998 WL 564012, at \*17 (S.D.N.Y. Sept.3, 1998) (where it was unclear whether complaints made by plaintiff constituted complaints of sexual harassment, jury would determine whether plaintiff did or did not unreasonably fail to take advantage of measures used by the employer to combat sexual harassment). Although plaintiff's federal claims against HFA have survived summary judgment, her state and local claims based on the HRL and the NYCHRL must be dismissed as plaintiff

has offered no proof that HFA encouraged, condoned or approved of Lieberman's misconduct, *see infra* Section II, D.

## C. Claim Against Parks

As an initial matter, Parks argues that it is not subject to Title VII liability as it did not have fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year as required by 42 U.S.C. § 2000e(b). In support of this argument, Parks cites two Delaware cases for the proposition that persons placed with a client by an employment agency are considered independent contractors and do not count toward this 15–employee threshold. However, this Court is not bound by case law developed in the Third Circuit. On the other hand, the Supreme Court has spoken on this issue stating that the touchstone under § 2000e(b) is whether an employer has employment relationships with 15 or more individuals. *Walters v. Metropolitan Educ. Enter., Inc.*, 519 U.S. 202, 117 S.Ct. 660, 665, 136 L.Ed.2d 644 (1997). An employment relationship, in turn, is determined primarily by looking to those individuals on the employer's payroll, commonly referred to as the "payroll method." *Id.* For purposes of this motion, it will be assumed that Parks had 15 or more individuals on its payroll during the period in question, whether temporarily assigned to clients or not, and hence meets the statutory definition of employer under Title VII.

Plaintiff alleges that Parks retaliated against her for filing a criminal complaint against Lieberman by refusing to give her another temporary assignment. To establish a prima facie claim of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of the activity; (3) the employer took adverse action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *Tomka*, 66 F.3d at 1308.

9. Also to be decided by a jury is Lieberman's status as a co-worker or supervisor for both

the quid pro quo and hostile work environment claims.

Although the protected activity usually takes the form of filing a formal complaint with the EEOC or filing a lawsuit, "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989). *See, e.g., Kotcher*, 957 F.2d at 64 (making internal complaint to company management protesting sexual harassment was protected activity); *Gostanian*, 1997 WL 214966 at *8 (voicing opposition to an unlawful employment practice is a protected activity). Similarly, pursuing a criminal proceeding against an alleged harasser is protected activity. Thus, the first element of a prima facie case has been satisfied. Although there is some dispute as to when Ms. Parks became aware of the criminal proceedings against Lieberman, drawing all inferences in favor of plaintiff, I will assume that plaintiff has met the second element. It is the third element, adverse employment action, that is fatal to plaintiff's claim. Plaintiff admits that she voluntarily left the Parks employment agency while Ms. Parks was actively searching for another assignment for her. Thus, plaintiff, who secured other employment on her own, did not suffer an adverse employment action at the hands of Ms. Parks. Accordingly, plaintiff's retaliation claim against Parks must fail. *See Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997) (plaintiff who suffered no negative consequences for refusing to comply with management's request to withdraw an EEOC charge did not state a claim for retaliation). As I have dismissed the only federal claim against Parks, I decline to exercise supplemental jurisdiction over any state and local claims. *See* 28 U.S.C. § 1367(c)(3).

### D. Claims Against Lieberman

■ I have already dismissed plaintiff's federal claims against Lieberman as an individual cannot be found personally

liable under Title VII. *Tomka*, 66 F.3d at 1314. However, Lieberman could potentially be held liable under the HRL and NYCHRL as an "aider and abettor." *Id.* at 1317. There is, however, a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor. As the Second Department recently stated:

> It is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting. Thus, plaintiff properly stated a cause of action against the co-employees under [HRL] § 296(6).

*Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (2nd Dep't 1998). Accordingly, plaintiff cannot prevail against Lieberman individually on her state and local claims unless she can first establish the liability of HFA.

■ For purposes of determining whether sexual harassment has taken place, claims under the HRL and Title VII can be examined identically; however, the standards for employer liability differ. *Seepersad v. D.A.O.R. Sec., Inc.*, 97 Civ. 2086, 1998 WL 474205, at *3 (S.D.N.Y. Aug.12, 1998). As the law in New York now stands, an " 'employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.' " *State Div. Of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 496 N.Y.S.2d 411, 412, 487 N.E.2d 268 (1985) (quoting *Totem Taxi v. State Human Rights Appeal Bd.*, 65 N.Y.2d 300, 491 N.Y.S.2d 293, 295, 480 N.E.2d 1075 (1985)). Because plaintiff has offered no proof whatsoever that HFA encouraged, condoned or approved of Lieberman's conduct, plaintiff's state and local claims against Lieberman are dismissed.[10] *See*

---

10. Because the wording of the provisions regarding aiding and abetting in the NYCHRL and the HRL are identical, *see Ettinger v. State University of New York College of Optom-*

*etry*, 95 Civ. 9893, 1998 WL 91089, at *9 (S.D.N.Y. Mar.2, 1998), plaintiff's claims based on New York City law are dismissed as well. *See also Mohamed v. Marriott Int'l,*

*Rivera v. Prudential Ins. Co. of America,* 95 Civ. 829, 1996 WL 637555, at *13 (N.D.N.Y. Oct.21, 1996) ("In order to hold an individual liable under the HRL, however, plaintiffs must show that the individual aided or abetted 'a primary violation of the HRL committed by another employee or the business itself.'") (quoting *McIlwain v. Korbean Int'l Inv. Corp.,* 896 F.Supp. 1373, 1383 (S.D.N.Y.1995)). As Lieberman acted alone, plaintiff's evidence is insufficient to support a claim of aider or abettor liability under the HRL. *See Rivera* at *id.*

## III. CONCLUSION

For the reasons set forth above, summary judgment is granted in favor of defendants Parks and Lieberman but is denied as to defendant HFA. A final pre-trial conference with plaintiff and HFA is scheduled for February 1, 1999 at 4:00 p.m.

SO ORDERED:

## EXHIBIT A

### POLICY STATEMENT

In keeping with the Statewide Policy on Sexual Harassment promulgated by the Governor's Office of Employee Relations on May 12, 1981, Title VII of the Civil Rights Act of 1964 as amended, and the New York State Human Rights Law, the New York State Housing Finance Agency has developed and adopted this Agency Policy Statement Regarding Sexual Harassment in the Work Environment. It is essential that all employees of the Agency, regardless of status, be mindful of the damage to individuals and the organization which result from sexual harassment. It is not only an offensive working condition which has devastating economic, psychological and physical effects on its victims; it is against the law.

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when: submission to the conduct is either an explicit or implicit term or condition of employment, submission to or rejection of the conduct is used as a basis for an employment decision affecting the person rejecting or submitting to the conduct, or the conduct has the purpose or effect of unreasonably interfering with an affected person's work performance or creating an intimidating, hostile, or offensive work environment. Such behavior will not be tolerated. It is considered a form of employee misconduct, and sanctions will be strictly enforced against offending individuals. Enforcement proceedings also will be levied against any supervisory personnel who knowingly permit such behavior to continue.

All employees have rights of redress and are encouraged to report any form of misconduct immediately to the Agency's Affirmative Action Officer. To ensure compliance with this policy statement, the Affirmative Action Officer has been assigned the responsibility of responding to harassment complaints, investigating allegations and enforcing appropriate sanctions, including disciplinary actions. Due to the sensitivity of the issue, employees are assured that complaints will be handled with confidentiality. The Affirmative Action Officer will also plan and schedule a training program designed to instruct and sensitize all concerned.

/s/Robert J. Steves
Robert J. Steves
Executive Director

## PART VII

### DISCRIMINATION COMPLAINT PROCEDURE

A. *Introduction*

Equality of opportunity is a civil right in New York State under the provisions of

*Inc.,* 905 F.Supp. 141, 157 (S.D.N.Y.1995) ("The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York...") (citation omitted).

Article 15 of the New York State Executive Law (Human Rights Law). Every employee and applicant for employment has the right to seek employment and to be employed in a climate that is free from restraint, intimidation, harassment or coercion.

This complaint procedure has been devised to provide for uniformity and equity in the resolution of allegations of discrimination in employment. It will be well publicized throughout the agency.

B. *Purpose*

This procedure has been designed to allow the agency the opportunity to resolve complaints internally. It is in no way intended to duplicate or circumvent options available to claimants through (1) employee organizations, (2) the New York State Division of Human Rights, (3) the Equal Employment Opportunity Commission, (4) U.S. Justice Department/Office for Civil Rights, (5) any compliance agency designated under Section 504 of the Rehabilitation Act of 1973, (6) Office of Federal Contract Compliance Programs, (7) other regulating agencies as may be appropriate, and (8) the judicial system. Use of this procedure will not suspend any time limitations for filing complaints otherwise set by Law, Rule or Regulation.

This procedure applies to all complaints of discrimination in employment based on race, color, national origin, creed, age, sex, marital status, religion, mental or physical disabilities, arrest record, criminal conviction, or Vietnam Era Veteran status. This procedure will serve as well for filing complaints under Section 504 of the Rehabilitation Act of 1973. It can be used by any employee or applicant for employment. Complaints may be based on any alleged act or omission in the nature of discrimination including, but not limited to:

INTERVIEWING
HIRING
DISMISSAL
DISCIPLINE
PERFORMANCE EVALUATIONS
JOB ASSIGNMENT
TRAINING OPPORTUNITIES

SHIFT ASSIGNMENT
PROMOTION
TRANSFER
WORKING CONDITIONS
HARASSMENT (Race, sex, color, national origin, etc.)
AGENCY POLICIES AND OTHER TERMS OR CONDITIONS OF EMPLOYMENT

---

Each employee has the right to representation by his or her labor representative in the event that the complaint involves a possible violation of contract.

C. *Definitions*

*Discrimination*—unlawful consideration or treatment of a person or group (either intentional or unintentional) based on race, color, national origin, creed, age, sex, marital status, religion, mental or physical disabilities, arrest record, criminal conviction, or Vietnam Era Veteran status.

*Discrimination in Employment*

1. Where the failure or refusal to hire, promote or train any individual or otherwise treat the individual equally with respect to compensation, terms, conditions or privileges of employment would not have occurred but for race, color, national origin, creed, age, sex, marital status, religion, mental or physical disabilities, arrest record, criminal conviction (except to the extent provided by law), or Vietnam Era Veteran status.

2. To limit, segregate or classify employees in such a way as to deprive or tend to deprive an individual of employment opportunities on the ba-

sis of the person's race, color, national origin, creed, age, sex, marital status, religion, mental or physical disabilities, arrest record, criminal conviction (except to the extend provided by law), or Vietnam Era Veteran status.

### D. *Responsibility*

#### 1. *Executive Director*

The Executive Director is responsible for the adoption and implementation of this complaint procedure and for assuring that sufficient staff is assigned and trained to properly carry it out. The Executive Director will also assure that it is well publicized throughout the agency.

If it is determined that a person has been subjected to an unlawful act of discrimination, the Executive Director will issue instructions for remedial action including disciplinary action where appropriate.

#### 2. *Affirmative Action Officer*

The Affirmative Action Officer is responsible for coordinating complaint proceedings. This includes counseling complainants, delegating investigations, and informing complainants of their right to file their complaint with other entities.

#### 3. *Other Staff*

All agency employees must cooperate with the Affirmative Action Officer in the investigation of complaints.

### E. *Discrimination Complaint Procedure*

#### 1. *The Process*

a. Any person with a complaint of discrimination should contact the agency Affirmative Action Officer. Complaints should be made within sixty (60) working days of the occurrence of the event which gave rise to the complaint. If the deadline is missed because of circumstances beyond the complainant's control, the Affirmative Action Officer will make the determination as to the reasonableness of requests and may extend the period to file to a maximum of one year.

b. The Affirmative Action Officer or the Personnel Officer will advise the complainant, counsel the complainant, explain the internal procedure, *explain the other options available to the employee including time limitations for filing complaints with State or Federal compliance agencies* and assist in completing the complaint form.

c. The Affirmative Action Officer or the Personnel Officer shall interview the complainant and study relevant documents.

d. The Affirmative Action Officer or the Personnel Officer shall interview witnesses and further investigate the situation. At each opportunity, the Affirmative Action Officer will seek conciliation or an informal settlement that is satisfactory to the parties concerned. The Affirmative Action Officer is responsible for investigating the feasibility and legality of any remedies that are proposed with the agency counsel and personnel officer as it appears necessary.

e. When the investigation is completed, the Affirmative Action Officer shall prepare a written report including recommendations for the agency head.

f. The agency head shall issue the final decision and recommendations in writing to the parties concerned.

g. The agency head's decision is final. If the complainant is not satisfied with the attempts to resolve the problem, the claimant may seek remedy through other sources.

h. At any point in the procedure, the claimant may withdraw the charge using the withdrawal form.

2. *Time Frame*

The agency will reach a decision within sixty (60) working days beginning from the date on which the written complaint is received.

3. *Confidentiality*

The substance of the investigation will remain confidential. No party or staff member shall disclose the results of the investigation or parts thereof.

The Affirmative Action Officer will inform all charged parties of the factual allegations and give them an opportunity to respond to all charges and evidence.

4. *Accessibility*

The agency will provide such assistance as may be necessary to enable a complainant to understand and participate in the complaint process. This may include sign language interpreters, wheelchair attendants, braille copiers, sound amplification equipment or foreign language interpreters.

5. *Retaliation*

Any employees who participate in the procedure may do so without fear of retaliation. It will be made clear that retaliation against an employee who has filed a discrimination complaint will result in disciplinary action.

6. *Time Accruals*

There will be no charge to accruals for time taken in conjunction with this procedure.

7. *Outcomes*

The outcome of an investigation is either dismissal of the complaint or remedial action. The complainant will be notified in writing of the outcome. If remedial action is ordered, the following avenues may be considered, consistent with the relevant law, rules and regulations, and negotiated agreements.

— placement of a person in a position that the individual would have been entitled to, had the discriminatory practice not occurred

— promotion of a person who was refused advancement because of a discriminatory circumstance

— hiring a person who was refused employment because of a discriminatory circumstance

— disciplinary action against a respondent in accordance with the appropriate employee agreement or regulations.

NOTE:

1. Individuals who have been appointed as a result of a discriminatory practice will not be penalized.

2. The above is not an exhaustive list of possibilities. Each case must be judged on its own merit.

8. *Follow-up*

The Affirmative Action Officer will maintain a log and file of complaints received. Six weeks from the date of a decision, the Affirmative Action Officer will determine whether the Executive Director directives have been carried out, or whether the case needs to be reopened. The findings will be reported to the Executive Director for appropriate action.

9. *Record Keeping*

The agency will keep a record of the status and determination of all complaints for at least two years. Cases that are unresolved and subject to external reviews will be maintained indefinitely or until they are resolved.