**James B. DAIS, Plaintiff,**

v.

**LANE BRYANT, INC., Defendant.**

**No. 97 CIV.2011(PKL).**

United States District Court,
S.D. New York.

April 12, 2001.

James B. Dais, Bronx, NY, Pro se.

Vorys, Sater, Seymour and Pease LLP, Melinda R. McAfee, Susan A. Cohen, Columbus, OH, Ochs & Goldberg, LLP, Mitchell D. Goldberg, New York City, for Defendant Lane Bryant, Inc.

### OPINION AND ORDER

LEISURE, District Judge.

*Pro se* plaintiff James B. Dais brings this action alleging unlawful racial discrimination and employment termination in violation of 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (hereinafter "Title VII"); New York State Human Rights Law, New York Executive Law § 296 (hereinafter "NYHRL"); and New York City Human Rights Law, New York City Administrative Code § 8–107 (hereinafter "NYCHRL"). Defendant Lane Bryant, Inc. moves for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is granted in part and denied in part.

### BACKGROUND

Defendant Lane Bryant, Inc. (hereinafter "Lane Bryant") is a national apparel retailer specializing in women's large sized clothing. Each of Lane Bryant's stores is typically staffed by a management team comprised of one store sales manager and two or more co-sales managers. In addition, Lane Bryant's stores are organized into districts, and each district is led by a district sales manager. The store sales managers in a given district report to that district sales manager.

On October 3, 1994, Lane Bryant hired plaintiff as a co-sales manager of its Roosevelt Field store. Plaintiff served in this position until July 31, 1995, when Lane Bryant promoted him to store sales manager of its Huntington store. Both the Roosevelt Field and Huntington stores are in Lane Bryant's Long Island District. Lane Bryant's store sales managers are responsible for all aspects of their store, including, *inter alia,* "achiev[ing] the sales plan," "merchandise processing," "hir[ing] individuals who are outgoing, enjoy selling, and can protect the Lane Bryant brand," "training co-sales managers in the skills and capabilities to manage [the] store,"

and various other administrative tasks. Def.'s Ex. D.D. 40.

By all accounts, plaintiff was quite successful in his first year with Lane Bryant. After plaintiff's promotion to store sales manager, the Huntington store began exceeding its planned sales objectives. For example, under plaintiff's leadership, the Huntington store achieved the greatest store improvement in average dollar sales for the Fall 1995 season. *See* Def.'s Ex. D.D. 43. Furthermore, in the Spring of 1996, the Huntington store achieved the number one rating in the Long Island District. *See* Pl.'s Ex. 31.

In December 1995, Lane Bryant named Max de Vries the District Sales Manager for its Long Island District. Over the course of the next year, de Vries visited the Huntington store at least every few weeks, and sometimes more frequently. On March 14, 1996, plaintiff received his yearly performance evaluation from de Vries. De Vries found that plaintiff's overall performance "meets expectations." Def.'s Ex. D.D. 57. De Vries also found that plaintiff's store management, including his merchandise presentation and leadership, "meets expectations." *Id.* However, de Vries noted that plaintiff's recruiting and training and development "needs improvement." *Id.*

On April 12, 1996, de Vries filled out a District Sales Manager Checklist for the Huntington store. *See* Def.'s Ex. 1 (attached to Declaration of Max de Vries, sworn to on March 25, 2000 (hereinafter "de Vries Decl.")). In this quarterly checklist, de Vries noted that the Huntington store needed improvement in sales, marketing, staffing, and control, while store maintenance/cleanliness met expectations. A few days later, on April 16, 1996, de Vries gave plaintiff an Unsatisfactory Performance Notice. *See* Def.'s Ex. 2 (attached to de Vries Decl.). De Vries cited plaintiff's "poor attitude," failure to "recruit and present co-sales manager candidates," and his "misrepresent[ation] of the store before taking a weekend off" as the reasons for the Notice. *Id.*

On May 30, 1996, de Vries recorded another District Sales Manager Checklist for the Huntington store. *See* Def.'s Ex. B.D. 12. On this date, however, de Vries found the store's sales and staffing were "meet[ing] expectations," while marketing, store maintenance/cleanliness, and control were listed as borderline between "meets expectations" and "needs improvement." *See id.* De Vries logged another District Sales Manager Checklist for the Huntington store on August 8, 1996. *See id.* This review was far more positive than any of de Vries' previous evaluations. In this checklist, de Vries found that the Huntington store's staffing was "above expectations." *Id.* Additionally, de Vries rated the store's sales, marketing, and control as meeting his expectations. The store's maintenance/cleanliness, however, was again listed as borderline between "meets expectations" and "needs improvement." *See id.*

The Huntington store's sales success continued through the Fall of 1996. The Huntington store exceeded its sales objectives for the months of September and October, which earned plaintiff monetary bonuses each month. *See* Pl.'s Ex. 55 A— B. On November 15, 1996, de Vries filled out another District Sales Manager Checklist for the Huntington store. *See* Def.'s Ex B.D. 12. In this evaluation, de Vries noted that the store's sales, marketing, and control met his expectations, while he listed staffing and maintenance/cleanliness as borderline between "meets expectations" and "needs improvement." *See id.*

Then, on December 11, 1996, de Vries visited the Huntington store with Brian Bee, Regional Sales Manager of Lane

Bryant's Northeast Region, and Director of Human Resources Rich Mascaro. After touring the store, Bee and de Vries met with plaintiff to discuss the store's condition and his performance. During this meeting, de Vries gave plaintiff a second Unsatisfactory Performance Notice. Although defendant contends that the final copy of this Notice was prepared in the store on December 11th, it is undisputed that de Vries had previously discussed issuing the Notice with Bee and had prepared a draft of the Notice prior to this date. *See* Deposition transcript of Brian Bee (hereinafter "Bee Dep.") at 23. In the Notice, de Vries expressed concern with plaintiff's managerial skills as well as the turnover in the Huntington store's co-sales managers. *See* Def.'s Ex. D.D. 9. Specifically, de Vries indicated that seven co-sales managers had resigned in the year and two months that plaintiff had been at the Huntington store, and that plaintiff had not recruited any candidates for this position. *See id.* This Notice also informed plaintiff that he was placed on thirty days probation, and that further disciplinary action—including termination—would be taken if no significant improvement occurred during the probationary period. Plaintiff alleges that, at some point during this meeting, de Vries told him that he "wasn't the right kind of guy for the job." Deposition transcript of James Dais (hereinafter "Dais Dep.") at 443.

On the following day, December 12, 1996, de Vries again visited the Huntington store, this time accompanied by Regional Presentation Coordinator Linda Rizzuto. Ms. Rizzuto's job duties included ensuring that all Lane Bryant stores were properly merchandised and organized. During this visit, Ms. Rizzuto made significant changes to the appearance of the Huntington store. *See* Dais Dep. at 99–100. Additionally, de Vries filled out a Christmas Store Checklist during this visit. *See* Def.'s Ex. 3 (attached to de Vries Decl.). De Vries rated the store "below standard" overall, while finding problems with the store's merchandising and staffing. *See id.*

Plaintiff alleges that on December 16, 1996, de Vries informed him that he would be transferring a large number of "key items" from the Huntington store to the Roosevelt Field store. *See* Dais Dep. at 88. Each season, Lane Bryant provides its stores with a list of "key items" for their salespeople to promote heavily. *See* Pl.'s Ex. A–9. According to plaintiff, de Vries explained that the transfer was necessary because these items were not selling well at the Huntington store. Plaintiff recounts that de Vries came to the Huntington store on December 16, 1996, along with Patrice Williams, the store sales manager of the Roosevelt Field store, and removed all of the number one and two key items, as well many of the third and fourth key items from the store. In short, plaintiff alleges that de Vries "cleaned me out of my key items." Dais Dep. at 88. Plaintiff further alleges that the Roosevelt Field store marked these items down to half price on the following day. *See id.*

On December 26, 1996, after receiving a written complaint about plaintiff from Huntington co-sales manager Robyn Liebman, de Vries asked to speak with plaintiff in his Huntington office. Plaintiff claims that de Vries said to him, "[w]ell Jim, this should not come as a surprise to you. You are out of here." Dais Dep. at 118. After being terminated,[1] plaintiff dropped his

---

1. Although Lane Bryant contends that plaintiff actually resigned his employment, it concedes that plaintiff was terminated for purposes of this motion. *See* Def.'s Mem. of Law in Support of Summary Judgment at 18 n. 11; Def.'s Reply to Plaintiff's Declaration in Op-

keys on his office desk and left the store. Lane Bryant replaced plaintiff with Louis Vite, a white male. *See* Bee Dep. at 198.

A number of suspect incidents preceded plaintiff's termination. First, plaintiff alleges that in the summer of 1996, after answering the phone, de Vries told him, "you know what, you don't sound like a black guy, Jim." Dais Dep. at 145. Although this was the only race-related comment that plaintiff ever heard de Vries make, plaintiff claims to have been subjected to another race-related comment while at Lane Bryant. In early 1995, plaintiff claims that Loren Killareau, the Roosevelt Field store sales manager at that time, commented that the store was becoming "too black." Dais Dep. at 248. Although it is unclear whether this comment referred to the store's sales staff or customers, plaintiff understood it as an attempt to influence his recruiting and hiring procedures. *See id.* Furthermore, plaintiff alleges that shortly after taking over the sales manager position in the Huntington store, two sales associates informed him that his predecessor had established a policy "that any black person that came into the store was to be followed." Dais Dep. at 292. Plaintiff insists that he immediately changed that policy after speaking with then District Sales Manager Kimberly Whitekamp. *See id.* at 293.

The next suspect incident occurred in August 1996, and also involved de Vries. On this occasion, de Vries had come to the Huntington store at plaintiff's request to speak with Ali Isaacs, one of the co-sales managers of the Huntington store, who had been the subject of complaints from both customers and other staff members. *See* Dais Dep. at 44. After arriving at the store and speaking with Ms. Isaacs, de Vries asked to speak with plaintiff privately. During this conversation, de Vries informed plaintiff that he had to be fired because Ms. Isaacs had accused him of sexual harassment. *See id.* Shortly thereafter, de Vries informed plaintiff that he was only kidding around and Ms. Isaacs had made no such accusation. *See id.* Although de Vries subsequently denied making such a statement, Regional Sales Manager Brian Bee recalls that de Vries informed him that he had in fact made this comment and that de Vries apologized to plaintiff for making the comment during their December 11, 1996 meeting. *See* Bee Dep. at 21, 153.

Finally, defendant refused to pay plaintiff a bonus he allegedly earned in December 1996. Plaintiff earned the bonus through defendant's "Holiday Contest '96" Incentive Program. Under this five-week program, defendant pledged to award fifty dollar gift certificates to the store sales managers of the two highest rated stores in the district each week. *See* Def.'s Ex. D.D. 2–3. The first week of the contest ran from November 29th to December 7th, and the Huntington store was the number two store in the district during that week. *See id.* However, defendant maintained that plaintiff was not in good standing at the time of the *payout* of the bonus because the December 11th Unsatisfactory Performance Notice had placed plaintiff on probation. *See* Bee Dep. at 11. Therefore, despite being in good standing for the duration of the contest week, defendant found plaintiff ineligible for this bonus. Plaintiff's store was in the top two in the district four of the five weeks of the contest, yet plaintiff did not receive any bonuses for the contest. *See* Declaration of James Dais, dated Apr. 17, 2000 (hereinafter "Dais Decl.").

On March 21, 1997, plaintiff filed the instant case alleging race discrimination

position to Def.'s Motion for Summary Judgment at 1 n. 2.

and unlawful termination in violation of 42 U.S.C. § 1981, the NYHRL, and the NYCHRL. On September 17, 1997, after his unsuccessful pursuit of remedies with the Equal Employment Opportunity Commission, plaintiff filed an amended complaint, adding a Title VII claim of race discrimination. On June 29, 2000, this Court denied defendant's first motion for summary judgment without prejudice because defendant failed to serve plaintiff with the requisite "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," in violation of Local Civil Rule 56.2. *See Dais v. Lane Bryant, Inc.,* 2000 WL 869489, at *2 (S.D.N.Y.2000). Having cured this deficiency, defendant now renews its motion for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The moving party has the burden to demonstrate that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994). The movant's burden will be satisfied "if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

In deciding a motion for summary judgment, the Court's function is not to try issues of fact, but instead to determine whether there remain any such issues to try. *See Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995). In so doing, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt,* 95 F.3d at 129. However, the substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

"A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Continental Group,* 859 F.2d 1108, 1112 (2d Cir.1988) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Thus, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996). Rather, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in his favor. *See Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. If there is "any evidence in

the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

▆▆▆ Moreover, the Second Circuit has advised that "special solicitude" should be afforded *pro se* litigants when confronted with motions for summary judgment. *See Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir.1988); *see also Hanlin v. Mitchelson*, 794 F.2d 834, 838–39 (2d Cir.1986). Therefore, a *pro se* plaintiff is entitled to have his pleadings held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). As such, the pleadings of a *pro se* plaintiff must be read liberally and interpreted to "raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, the fact that plaintiff is proceeding *pro se* does not otherwise relieve him from the usual requirements of summary judgment. *See Adams v. New Jersey Transit Rail Operations*, No. 97 Civ. 430, 2000 WL 224107, at *7 (S.D.N.Y. Feb.28, 2000) (Preska, J.).

▆▆▆ Finally, the Second Circuit has instructed that trial courts must be cautious about granting summary judgment to an employer when its intent is at issue. *See Gallo*, 22 F.3d at 1224. Indeed, because an employer who discriminates is unlikely to leave a "smoking gun" attesting to its discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence and is usually constrained to rely solely on circumstantial evidence. *See Chambers*, 43 F.3d at 37 (citing *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991)). Therefore, district courts must carefully scrutinize the affidavits, exhibits, and depositions for circum-

stantial proof which, if believed, would show discrimination. *See Gallo*, 22 F.3d at 1224. However, this duty of care does not mean that district courts lack the authority to grant summary judgment for either party in employment discrimination cases. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000) (McLaughlin, J.) ("[s]ummary judgment is appropriate even in discrimination cases"); *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994) ("[T]he District Court's impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable."); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (Kaufman, J.) ("the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation."); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) ("trial courts should not 'treat discrimination differently from other ultimate questions of fact'") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

## II. Plaintiff's Claims

Plaintiff's allegations can be characterized as involving two forms of discriminatory conduct: (1) discriminatory termination, and (2) the creation of a hostile work environment because of his race. The Court addresses whether there are genuine issues of material fact as to each of these claims in turn.

### A. Wrongful Termination Claims under Title VII, Section 1981, and the NYHRL

▆▆▆ Title VII provides, in relevant part, that it shall be unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII discrimination claims are governed by the three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Weinstock,* 224 F.3d at 42. Discrimination claims brought under Section 1981 and the NYHRL are also analyzed using the Title VII framework. *See, e.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (Title VII analysis applies to § 1981 claims); *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) ("New York state courts have adopted the [Title VII] analysis for discrimination claims arising under the NYHRL."). Therefore, since plaintiff's Title VII, Section 1981, and NYHRL claims assert the same allegation of unlawful discriminatory termination, these claims will be analyzed together and the Court's holding will apply with equal force to each claim.

Under the burden shifting framework established in *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a *prima facie* case of discriminatory termination. 411 U.S. at 802, 93 S.Ct. 1817. In order to establish a prima facie case of discriminatory termination, plaintiff must show (1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred under circumstances giving rise to an inference of discrimination. *See Tarshis v. Riese Org.,* 211 F.3d 30, 35–36 (2d Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817); *Chambers,* 43 F.3d at 37. The fourth element of the prima facie case can be satisfied by a showing that the plaintiff's position remained open after he was discharged, or that he was replaced by someone outside his protected class. *See de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2d Cir.1996). Plaintiff's burden of proof at the *prima facie* stage is *de minimis. See Chambers,* 43 F.3d at 37.

Once the plaintiff has established a prima facie case of discriminatory termination, the burden of production shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for its actions. *See Reeves,* 120 S.Ct. at 2106. To satisfy its burden, the defendant must produce admissible evidence sufficient to justify a judgment in its favor. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chambers,* 43 F.3d at 38. "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." *Tarshis,* 211 F.3d at 36. If the employer makes such a showing, the presumption of discrimination completely "drops out of the picture." *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742. "It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 507, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

Plaintiff must then be afforded the opportunity to prove by a preponderance of the evidence that the defendant's proffered, nondiscriminatory reason was not its true reason for the employment decision, and that race discrimination was defendant's real motivation. *See id.* at 507–08, 113 S.Ct. 2742. "That is, the plaintiff

may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 120 S.Ct. at 2106, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). The plaintiff need not submit additional evidence to demonstrate discrimination, but can rely solely on the evidence establishing the prima facie case and the inferences drawn therefrom. *See St. Mary's*, 509 U.S. at 511, 113 S.Ct. 2742 ("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and . . . no additional proof of discrimination is required"). Therefore, the ultimate question is whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. *Weinstock*, 224 F.3d at 42.

■ Here, plaintiff has clearly established a *prima facie* case of discriminatory termination. First, plaintiff is a black male. Second, while plaintiff's performance evaluations do cite some areas for improvement, they appear satisfactory overall. Indeed, the majority of plaintiff's evaluations rate both his performance and the Huntington store's performance as meeting expectations. Moreover, plaintiff continually exceeded his sales expectations up until his termination, which earned him both recognition from his superiors and monetary bonuses. These considerations indicate that plaintiff's performance was satisfactory, particularly within the context of the papers submitted in an inchoative summary judgment motion. *See de la Cruz*, 82 F.3d at 21 ("a performance evaluation that is positive overall is sufficient to withstand summary judgment at the prima facie case stage of analysis"). Third, plaintiff was terminated. Finally, plaintiff was replaced by a white male.

■ Likewise, defendant has satisfied its burden of proffering a legitimate, non-discriminatory reasons for plaintiff's termination. Defendant contends that it terminated plaintiff because of his poor managerial skills. Specifically, defendant claims that plaintiff's poor managerial skills were focused in three major areas: (1) poor leadership, (2) failure to recruit, and (3) a lack of organization and cleanliness. Defendant believes these attributes are well documented in plaintiff's performance evaluation, two Unsatisfactory Performance Notices, several District Sales Manager Checklists, and a written complaint from a co-sales manager. This documentary evidence suffices to fulfill defendant's minimal burden at this stage.

The parties' threshold burdens having been fulfilled, the remaining question is whether, given the evidence proffered by the defendant, plaintiff has established a genuine issue of material fact as to his claim of discriminatory termination. The Court finds that he has. It is well established that a plaintiff may establish pretext for discrimination and thereby successfully oppose summary judgment by demonstrating inconsistencies or contradictions in the employer's proffered non-discriminatory reasons for its action. *See, e.g., Chambers*, 43 F.3d at 38–39; *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994). Plaintiff has identified such inconsistencies and contradictions, and thereby established genuine issues of material fact in each area of his managerial skills that defendant alleged were deficient. The Court will examine each in turn.

## 1. Leadership Skills

■ Defendant contends that plaintiff's poor leadership skills were demonstrated by the fact that two co-sales managers asked to be transferred and five co-sales managers resigned during his tenure at

the Huntington store.[2] Plaintiff counters that the transfer of two co-sales managers and the resignation of five co-sales managers was totally unrelated to his leadership or management skills. In support of this assertion, plaintiff proffers evidence that one co-sales manager asked to be transferred to another Lane Bryant store in order work closer to her home, another requested a transfer after being disappointed that she did not receive the sales manager position at the Huntington store, a third resigned to accept a higher paying job at a nearby store, a fourth resigned after it was alleged that she stole merchandise from the store, and a fifth left after receiving complaints from customers and other staff members. *See* Dais Dep. at 349–98. It is undisputed that plaintiff attempted to explain that these transfers and resignations were not attributable to his leadership during the December 11, 1996 meeting with Bee and de Vries, before Bee cut him off and told him to take responsibility for this turnover. *See* Bee Dep. at 22.

Moreover, although Bee claims that plaintiff's co-sales manager turnover is "extraordinarily high," defendant failed to provide any evidence to compare plaintiff's turnover rate with those of other Lane Bryant stores. In fact, Bee admitted that the average turnover rate for co-sales managers at Lane Bryant was not published or available. *See* Bee Dep. at 100. Therefore, without a basis for comparison to its other stores, Bee's conclusory statement about the Huntington store's turnover is unhelpful to the Court, for purposes of deciding the instant motion.

Finally, plaintiff asserts that the Huntington store's sales success demonstrates his superior leadership skills and calls into question defendant's proffered reason for his termination. Plaintiff points out that he earned bonuses for his sales success in February, March, June, August, September, October, and November of 1996, and had the highest rated store in the Long Island District for the Spring of 1996. *See* Pl.'s Ex. 9, 31. Surely it is questionable whether a store under poor leadership would continually exceed its sales goals. Indeed, defendant's claim of poor leadership is undermined in the face of its award of bonuses to plaintiff throughout 1996. Thus, plaintiff's sales success belies defendant's allegation that he had poor managerial skills.

## 2. Recruitment

Defendant also maintains that plaintiff's failure to recruit co-sales manager candidates illustrates his poor managerial skills. Defendant claims that recruiting is an important function of a store sales manager, and despite numerous warnings, plaintiff "did not make any real attempts" to recruit co-sales managers who had left. Def.'s Mem. of Law in Support of Summary Judgment (hereinafter "Def.'s Mem.") at 21.

Plaintiff has countered defendant's assertion by proffering evidence that he recruited three co-sales manager candidates during his seventeen months at Huntington. Because plaintiff did not have the authority to hire co-sales managers on his own, *see* Dais Dep. at 206, plaintiff set up interviews for three co-sales manager candidates with de Vries. Of these three candidates, only one—Alix Duplessis—accepted an offer from de Vries. According to plaintiff, Ms. Duplessis later resigned from her co-sales manager position at the

2. In plaintiff's December 11, 1996 Unsatisfactory Performance Notice, de Vries mistakenly asserted that seven co-sales managers had *resigned* in plaintiff's year and two months at the Huntington store. *See* Def.'s Ex. D.D. 9.

Huntington store to take a higher paying job elsewhere. *See id.* at 374–75. Plaintiff claims that the second candidate—a woman named Burdell—was not hired by de Vries but was subsequently hired by Lane Bryant's Rego Park store. *See id.* at 417. Plaintiff claims that he never heard what happened to the third candidate after he set up the interview. *See id.* Finally, plaintiff alleges that he attempted to recruit co-sales manager candidates from stores in a nearby mall, but had limited success. *See id.* at 418.

In addition, plaintiff contends that his evaluations cast doubt on defendant's argument that he failed to recruit adequately. Indeed, de Vries commended plaintiff for his recruiting and overall staffing of the Huntington store in his August 8, 1996 District Sales Manager Checklist. In this checklist, de Vries found that the Huntington store's staffing was "above expectations" and wrote a comment that plaintiff should "keep hiring great salespeople." Def.'s Ex. B.D. 12. Plaintiff points out that in his next checklist, written on November 15, 1996, de Vries found the Huntington store's staffing was borderline between "meets expectations" and "needs improvement." Plaintiff asserts that this is a far cry from indicating that his overall recruiting and hiring was unsatisfactory. Finally, plaintiff proffers letters from an employment agency which laud his recruiting and hiring of disabled employees. *See* Pl.'s Ex. 58 A–B.

### 3. Organizational Skills and Cleanliness

Finally, defendant claims that plaintiff's poor managerial skills are evidenced by the Huntington store's uncleanliness and lack of organization. Defendant claims that it had warned plaintiff on many occasions about this problem and that the condition of the store on December 11, 1996 was deplorable. *See* Bee Dep. at 19. However, it is undisputed that plaintiff was out sick for the three days prior to December 11, 1996. It is also undisputed that the Huntington store is one of Lane Bryant's oldest and largest stores in Long Island, as well as the only store that has never been renovated. *See* Dais Dep. at 56. Therefore, plaintiff claims that these accusations of uncleanliness and lack of organization should not be attributed solely to his managerial skills.

Furthermore, plaintiff stresses that, while the store sales manager is ultimately responsible for all facets of the store, the co-sales managers are responsible for the store's upkeep in his absence. Plaintiff alleges that some of the co-sales managers sent to work at the Huntington store by de Vries were extremely lax in organization and cleanliness skills, making his job more difficult. Finally, plaintiff again argues that his evaluations undermine defendant's assertion regarding the store's condition and organization. He points out that neither of his two Unsatisfactory Performance Notices mentioned anything about his lack of organization or the cleanliness of the store. Indeed, the only references to the Huntington store's cleanliness were in the May 30, August 8, and November 15, 1996 District Sales Manager Checklists, which each listed store maintenance/cleanliness as on the borderline between "meets expectations" and "needs improvement." *See* Def.'s Ex. B.D. 12. Plaintiff contends that these references cast doubt on defendant's proffered reason for his termination.

### 4. Other Indicia of Discrimination

Plaintiff also maintains that other evidence further weakens defendant's proffered reason for his termination. First, plaintiff claims that de Vries' remarks that he "didn't sound like a black guy" and

"wasn't the right kind of guy for the job" indicates defendant's discriminatory intent and racial animus. Defendant argues, however, that these statements were simply innocuous stray remarks which are insufficient to demonstrate pretext for discrimination. The Court disagrees. While defendant is correct that stray remarks *alone* do not constitute sufficient evidence to make out a case of employment discrimination, the Second Circuit has recognized that when stray remarks are accompanied by other indicia of discrimination, "the remarks can no longer be deemed 'stray' and the jury has a right to conclude that they bear a more ominous significance." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998). Thus, when de Vries' alleged statements are coupled with plaintiff's proffered evidence regarding his leadership, recruitment, and organizational skills; de Vries false accusation that plaintiff had sexually harassed Ali Isaacs; the Huntington store's former policy of following black customers around the store; defendant's failure to pay plaintiff the bonus he earned during its Holiday Contest; the transfer of most of the Huntington store's key items the day after plaintiff was placed on probation; and the circumstances surrounding plaintiff's December 11, 1996 Unsatisfactory Performance Notice, these comments can no longer be deemed stray. While each of these statements or events by themselves might arguably be insufficient to permit a race discrimination suit to survive summary judgment, taken together they are more than enough to support a jury verdict that plaintiff was terminated on account of his race.

In sum, plaintiff has clearly raised a genuine issue of material fact as to the credibility of defendant's proffered explanation for his termination. Crediting Dais' sworn statements and drawing all permissible inferences in his favor, the trier of fact could find that Dais' managerial skills were respectable, and that his leadership skills, recruitment efforts, and organization/cleanliness were quite satisfactory. Furthermore, plaintiff proffers additional evidence which could lead the fact finder to conclude that Lane Bryant's reasons for Dais' termination should be discredited, and infer that the real reason was an unlawful discrimination. The fact questions and credibility determinations raised by plaintiff's evidence must be resolved by a trier of fact, and not the Court. *See Gallagher v. Delaney,* 139 F.3d 338, 342 (2d Cir.1998) (Weinstein, J.). Accordingly, the Court denies defendant's motion for summary judgment on plaintiff's discriminatory termination claims under Title VII, 42 U.S.C. § 1981, and the NYHRL.

**B. Hostile Work Environment Claims under Title VII and the NYHRL**

Defendant also moves for summary judgment on plaintiff's hostile work environment claims under Title VII and the NYHRL. Title VII requires employers to provide an atmosphere free of racial abuse or hostility. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Snell v. Suffolk County,* 782 F.2d 1094, 1096 (2d Cir.1986). When determining whether a hostile work environment exists, the standards under Title VII and the NYHRL are identical. *See DeWitt v. Lieberman,* 48 F.Supp.2d 280, 293 (S.D.N.Y.1999). In order to establish a hostile work environment claim, a plaintiff must first demonstrate that his workplace was permeated with "discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Second, a plaintiff must show that a specific basis exists for

imputing the conduct that created the hostile environment to the employer. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). Additionally, a plaintiff must establish both that there existed "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive," and that the plaintiff "subjectively perceive[d] the environment to be abusive." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Finally, in determining whether an environment is hostile, the Court must consider the totality of the circumstances. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367.

 Generally speaking, "isolated remarks or occasional episodes or harassment will not merit relief under Title VII; in order to be actionable, the incidents ... must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995). When racial slurs, comments, or jokes are alleged to have created the hostile work environment, as plaintiff alleges in the instant case, courts must examine the quantity, frequency, and severity of the alleged comments. *See Schwapp v. Avon,* 118 F.3d 106, 110–11 (2d Cir. 1997). In order to constitute a hostile work environment, the Second Circuit has stressed that there must be a "steady barrage of opprobrious racial comments." *Id.* at 110 (quoting *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994)). Indeed, "plaintiff must prove more than a few isolated incidents of racial enmity." *Snell,* 782 F.2d at 1103.

The Court concludes that there is insufficient evidence indicating that a hostile work environment existed at Lane Bryant. While plaintiff has proffered evidence that de Vries once remarked, "you don't sound like a black guy," this statement falls far short of establishing the pervasive racial harassment necessary to constitute a hos-

tile work environment. Plaintiff seems to confuse the general hostility that he felt working for de Vries with the elements of the hostile work environment claim under Title VII and the NYHRL. Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's Title VII and NYHRL hostile work environment claims.

## C. NYCHRL Claims

 Plaintiff's wrongful termination and hostile work environment claims under the NYCHRL must also be dismissed. As defendant correctly points out, the NYCHRL governs discriminatory conduct that occurs exclusively within the City of New York. *See Casper v. Lew Lieberbaum & Co.,* 1998 WL 150993, at \*4 (S.D.N.Y.1998); *see also Levy v. City Comm'n on Human Rights,* 85 N.Y.2d 740, 743, 628 N.Y.S.2d 245, 651 N.E.2d 1264 (1995) ("The Administrative Code of the City of New York vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York."). Here, plaintiff has not asserted that any of the alleged discriminatory acts took place within the boundaries of New York City. Rather, plaintiff has maintained that all of defendant's alleged discriminatory conduct took place in Garden City and Huntington, New York, well outside of the boundaries of New York City. Consequently, the Court dismisses all of plaintiff's NYCHRL claims.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is HEREBY GRANTED IN PART and DENIED IN PART. Defendant's motion to dismiss plaintiff's wrongful termination claims under Title VII, 42 U.S.C. § 1981, and the NYHRL is DENIED. Defendant's mo-

tion to dismiss plaintiff's hostile work environment claims under Title VII and the NYHRL is GRANTED. Defendant's motion to dismiss plaintiff's NYCHRL claims in their entirety is GRANTED. The parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on April 25, 2001, at 10:30 a.m. for a pre-trial conference.

**SO ORDERED**