**Maria Munoz KANTHA, Plaintiff,**

**v.**

**Jerome BLUE, individually, Evonne Jennings Tolbert, individually, George Doe, a State of New York Official, individually, James Roe, a State of New York Official, individually, Thomas Poe, a State of New York Official, individually, Defendants.**

No. 01 CIV. 10809(CM).

United States District Court,
S.D. New York.

May 2, 2003.

94

Drita Nicaj, Lovett & Gould, Esqs, White Plains, NY, for Maria Munoz Kantha, plaintiff.

Robert N. Felix, Constantine Aristidis Speres, Eliot Spitzer, Attorney General of the State of N.Y., New York City, for Jerome Blue, Individually, Evonne Jennings Tolbert, Individually, George Doe, A State of New York Official, Individually, James Roe, A State Of New York Official, Individually, Thomas Poe, A State of New York Official, Individually, defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff Maria Munoz Kantha brings this action against defendants Jerome Blue, Evonne Jennings Tolbert, and three unidentified New York state officials pursuant to 42 U.S.C. § 1983 ("Section 1983"), claiming that Blue discriminated against her because she was female (in violation of the Fourteenth Amendment) and that both defendants retaliated against her because she engaged in constitutionally protected speech (in violation of the First Amendment). Plaintiff also asserts a claim against Blue under New York Executive Law § 296(6). Defendants Blue and Tolbert now move for summary judgment on all claims against them.[1]

1. In an oral decision at a March 8, 2002 hearing, I dismissed plaintiff's complaint against Tolbert insofar as it alleged gender discrimination after counsel conceded that plaintiff's claim against Tolbert was limited to retaliation. [Duffy Aff., Ex. D, at 7] ("What we're claiming specifically with respect to Ms. Tolbert is that, based on an agreement [with people in State Operations] it is believed that she be appointed to Commissioner, she terminated our client."). Tolbert and Kantha apparently disagree on the consequences of that ruling. Kantha argues that I dismissed only her state law claim against Tolbert charging gender discrimination, while Tolbert believes that I only dismissed plaintiff's equal protection claim. Insofar as both causes of action require that Tolbert have discriminated against Kantha on the basis of her gender, I dismissed both, based on plaintiff's representation that Tolbert was not charged with gender discrimination.

For the following reasons, defendant Tolbert's motion is granted and defendant Blue's motion is denied.

## I. *Facts*

Rule 56.1 of the Local Rules of Civil Procedure requires a party opposing summary judgment to submit a "separate, short and concise statement of the material facts as to which it is contended there exists a genuine issue to be tried." Each statement of material fact "must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Many of the statements of material fact set forth in plaintiff's 56.1 Statement either do not find support in the evidence cited or are supported by evidence that would be inadmissible at trial. The following facts are supported by admissible evidence and interpreted most favorably to plaintiff, the non-moving party.

On July 26, 1999, Governor George E. Pataki's Office appointed plaintiff Kantha as Deputy Regional Commissioner of the New York State Division of Human Rights. [Plaintiff's 56.1 Statement ¶ 5]. At that time, defendant Blue was the Commissioner of the Division. *Id.* at ¶ 3. Tolbert was appointed as Executive Deputy Commissioner on August 2, 1999. *Id.* at ¶ 7. As the Division was organized at the time of Tolbert's appointment, Blue headed the Division, Tolbert worked directly under Blue, and Kantha worked directly under Tolbert. [*Id.* at ¶ 6; Nicaj Affirmation, Ex. 7].

### A. *Blue's Actions Toward Female Employees*

Kantha alleges that several of Blue's actions toward her and other female employees at the Division evidence Blue's animus toward women.

### 1. *Failure to Introduce Female Executives*

Plaintiff testified at her deposition that she, Tolbert, and Gina Lopez (General Counsel at the Division) attended an Equal Employment Opportunity Commission conference at which Blue failed to introduce them to the audience. Kantha also testified about an occurrence where Blue failed to acknowledge her when he introduced her subordinate staff (which included men and women) at a conference in Albany. Kantha contends that Blue's failure to introduce her humiliated her in front of a large audience. [Plaintiff's 56.1 Statement ¶ 11; Nicaj Affirmation, Ex. 4, at 165–66].

### 2. *Verbal Abuse*

Kantha testified that Blue yelled at female Division employees, including Tolbert and her, but she never saw him yell at any men. [Plaintiff's 56.1 Statement ¶ 12; Nicaj Affirmation, Ex. 4, at 166–68]. She also testified that Blue called at least one female employee "incompetent" and "useless." [Plaintiff's 56.1 Statement ¶ 7; Nicaj Affirmation, Ex. 4, at 142].

### 3. *Preventing Female Employees From Performing Their Jobs*

Plaintiff alleges that Blue prevented female executives from performing their job functions. She testified that Vallorie Lovelace, the Administrator of Human Resources, lost weight when Blue "completely disregarded" her and met with employees under her supervision. [Plaintiff's 56.1 Statement ¶ 13; Nicaj Affirmation, Ex. 4, at 113–14, 204, 232]. Kantha also testified that Blue excluded Denise Washington, an administrative law judge, from the decision-making process and then terminated her employment. [Plaintiff's 56.1 Statement ¶ 16; Nicaj Affirmation, Ex. 4, at 184–86]. The bulk of the evidence that

plaintiff proffers to oppose defendants' motion for summary judgment, however, concerns Blue's treatment of three women: defendant Tolbert, Margaret Gormley–King, and plaintiff herself.

### a. Tolbert

Kantha argues that two incidents evidence Blue's attempt to subvert Tolbert's authority at the agency. First, Blue objected to Tolbert's request that she receive a copy of reports sent to Blue from Bureau Heads and Regional Directors. [Plaintiff's 56.1 Statement ¶ 7; Nicaj Affirmation, Ex. 7]. Second, he attempted to alter the organizational structure of the Division in such a way that Tolbert would no longer directly supervise Kantha. [Plaintiff's 56.1 Statement ¶¶ 7–8; Nicaj Affirmation, Ex. 9]. After a meeting on the subject—attended by Tolbert, Blue, and Chicatelli (among others)—Blue abandoned his reorganizational effort. [Plaintiff's 56.1 Statement ¶ 9; Nicaj Affirmation, Ex. 6, at 119–20].

In addition, two Division employees (Margaret Gormley–King and Booker Ingram) testified that Blue kept Tolbert "out of the loop" and "excluded her from day-to-day business activities." [Plaintiff's 56.1 Statement ¶ 10; Nicaj Affirmation, Ex. 10, at 22–24; Nicaj Affirmation, Ex. 12, at 40].

### b. Gormley–King

Blue directed male Division employees from the Buffalo office to meet with the local commission in Rockland County, even though it was within Margaret Gormley–King's jurisdiction and a part of her job responsibility. [Plaintiff's 56.1 Statement ¶ 21; Nicaj Affirmation, Ex. 12, at 13–16]. Gormley–King wrote a memorandum to Blue in which she complained about the incident. [Nicaj Affirmation, Ex. 25]. Blue responded with a memorandum in which he criticized her job performance. [Nicaj Affirmation, Ex. 26]. Gormley–King concluded from this incident that

Blue had difficulty dealing with women. [Nicaj Affirmation, Ex. 12, at 13].

### c. Kantha

Kantha testified that Blue excluded her from all management meetings, [Plaintiff's 56.1 Statement ¶ 17; Nicaj Affirmation, Ex. 4, at 195]; ordered her to perform tasks that needed to be performed by lower-ranked employees working under Tolbert's supervision, [Plaintiff's 56.1 Statement ¶ 18; Nicaj Affirmation, Ex. 4, at 209–10]; prevented staff from giving her information that she needed to perform her job, [Plaintiff's 56.1 Statement ¶ 18; Nicaj Affirmation, Ex. 4, at 202–03]; and eliminated some of Kantha's duties and responsibilities by preventing her from leaving the office and going out to the "field." [Plaintiff's 56.1 Statement ¶ 18; Nicaj Affirmation, Ex. 4, at 203–04].

Plaintiff also related an incident involving Wilson Ortiz, a staff member who was subordinate to Kantha in the Division's chain of command. Plaintiff testified that Blue transferred Ortiz from the Brooklyn office to the White Plains office without first consulting with her. [Plaintiff's 56.1 Statement ¶ 17; Nicaj Affirmation, Ex. 4, at 34–35]. She also claimed that Blue told Ortiz that he no longer reported to Kantha, but should report directly to Blue instead. [Plaintiff's 56.1 Statement ¶ 21; Nicaj Affirmation, Ex. 4, at 200–01]. Kantha further alleges that Blue told a lot of regional directors (who worked under Kantha in the chain of command) that they should also report directly to him. *Id.*

### d. Assigning Work to Males

Plaintiff presents evidence tending to establish that Blue assigned work to males that was within the job responsibilities of female employees. Gormley–King testified, for example, that Blue delegated responsibilities to male employees from Buf-

falo. Another Division employee, Edward Watkins, testified that Blue appeared to delegate responsibilities that could have been performed by Tolbert and Kantha (in their positions as executives in the Division) to two males, David Bailey and Mike Greason. [Nicaj Affirmation, Ex. 12, at 24–37]. Watkins testified that those two male employees seemed to work well with Blue, while Blue appeared uncomfortable when he dealt with Kantha and Tolbert. *Id.* at 22, 36.

### B. *Plaintiff's Complaints*

Kantha expressed her concerns about Blue's conduct, both orally and in writing, to Nita Chicatelli, James Natoli (a Senior Program Associate), William Howard (Deputy Director of Governor Pataki's State Operations), Tom Doherty (head of Governor Pataki's Appointment Office), as well as to Blue himself. [Plaintiff's 56.1 Statement ¶ 19; Nicaj Affirmation, Ex. 14–23, 28]. She testified, for example, that she told Doherty that Blue conflicted with Tolbert because Tolbert was a "strong woman." [Nicaj Affirmation, Ex. 4, at 407]. She also sent out several memoranda to various people.

#### 1. *The December 23, 1999 Memorandum and its Aftermath*

In a December 23, 1999 memorandum to Blue, which she carbon copied to Nita Chicatelli, Kantha complained of Blue's "outward hostile management approach" and "abuse of power towards your administrative staff and other senior staff members." [Nicaj Affirmation, Ex. 14]. "Your disregard for my position as Deputy Commissioner, and exclusion of any decision making process with regard to my regional affairs department," she wrote, "undermines my authority as an administrator at the Division of Human Rights." *Id.*

Blue replied to Kantha in a memorandum criticizing her job performance. [Nicaj Affirmation, Ex. 24]. According to

Blue, Kantha had ignored his "repeated requests" for certain "material and information," missed "more Executive Staff Meetings than any other member of the staff," failed to inform him when she was not going to be in the office, and used insensitive language. *Id.* Blue's criticisms prompted Kantha to respond in a memorandum to Blue, Nita Chicatelli, James Natoli, and William Howard. [Nicaj Affirmation, Ex. 15].

#### 2. *February 29, 2000 Memorandum*

In her February 29, 2000 memorandum, addressed to Blue and carbon copied to Chicatelli, plaintiff complained that Blue had not "engaged in any professional discussions with my department" for several months. [Nicaj Affirmation, Ex. 16]. She also expressed her opinion that Blue's "micro management has set the division back," and that he had "oppressed my ongoing professional development" and created a "hostile work environment." *Id.*

#### 3. *May 15, 2000 Memorandum*

Kantha sent another memorandum to Blue on May 15, 2000, and again carbon copied it to Chicatelli, Natoli, and Howard. In the memorandum, she criticized several of Blue's management decisions—she complained, for example, that Blue had scheduled individual meetings with staff working under her management—and voiced concern about his conduct toward her. [Nicaj Affirmation, Ex. 19]. Specifically, she claimed that at a May 11, 2000 meeting Blue screamed at her "in a high pitched voice and in an unprofessional and disrespectful manner." *Id.* The memo concluded by warning: "I will no longer tolerate your abuse and sexist remarks and I will not attend any meetings where I am the target of you abusive behavior. I will be forwarding an administrative internal EEO complaint with the office of State

Operations re: your abusive and discriminatory behavior." *Id.*

### 4. *June 29, 2000 Memorandum*

On June 29, 2000, plaintiff sent a confidential memorandum to James Natoli requesting a State Operations representative's intervention in the "personnel problems at the New York State Division of Human Rights." [Nicaj Affirmation, Ex. 20]. Specifically, Kantha requested a representative's presence at any of her performance appraisal meetings to be conducted by Blue.

The memorandum went on to make several allegations regarding Blue's conduct. It stated:

> [Blue] has humiliated me and intimidated me publicly and in front of my colleagues and subordinates. He has created a Hostile Work Environment for all employees at the New York State Division of Human Rights.
>
> Commissioner Blue has dismantled the Division of Human Rights by polarizing staff; he has no professional communication with any of his female executives. Now he is threatening me with another performance evaluation; aside from which, he has unofficially replaced and given all of my responsibilities to males. *Therefore, how is Commission Blue going to supervise me when he has excluded me from the administrative protocol?* He has told Regional Directors and staff not to inform me of his discussions with them. (Memos have been forwarded to you).
>
> Commissioner Blue has developed a serious pattern of excluding all his female executives from any planning, (i.e. budget and operations) in the development of the strategic plan for this agency. He is demonstrating the same behavior in dealing with Margaret King Regional Director of the White Plains office. (Memo attached)
>
> Commissioner Blue *sent a young male to represent the Division* at our Local Human Rights Commission *although he knew that Margaret and I were attending.* (Memos Attached)
>
> Commissioner Blue has continuously debased me in front of my colleagues who have witnessed this behavior. Commissioner Blue has now assigned Michael Twomey Greason to harass me via Memos. (Memos available for review).
>
> I believe it is time to clarify our roles as appointed officials within the New York State Division of Human Rights, so that we can get our work done.

*Id.* (emphasis in original).

### 5. *July 17, 2000 Memorandum*

Kantha's July 17, 2000 memorandum, sent to Chicatelli, appears to respond to a memorandum from Blue. In it, plaintiff again requested State Operations' involvement in Blue's evaluation of her job performance. [Nicaj Affirmation, Ex. 21]. Plaintiff contended that Blue sought "to take punitive action (i.e. further probation and possible disciplinary action) for changes to my performance standard that were not communicated to me." *Id.* She also alleged that she continued "to be harassed for attending a meeting at one of my Regional Offices on July 7, 2000 and for attending the signing of the Governor's Hate Crime Bill on July 10, 2000." *Id.*

### 6. *July 24, 2000 and August 1, 2000 Memoranda*

The last three memoranda that plaintiff presents in this motion for summary judgment involve Blue's assignment of executive office space at the Division's headquarters in the Bronx. In the July 24, 2000 memorandum, sent to Chicatelli and carbon copied to Natoli and Howard, Kantha argued that "the current office allocation is inappropriate by any normal stan-

dards and chain of command," because the fact that she "was hired as the Deputy Commissioner for Regional Affairs to manage the largest department in this agency is not reflected in the assignments of the executive offices at Fordham Plaza." [Nicaj Affirmation, Ex. 22].

Kantha appears to have argued that the assignment of office space reflected Blue's animus toward women. "The current figuration would reflect that there is only *one female* executive assigned in the new executive suite and *four males,* three of which are subordinate to me." *Id.* (emphasis in original). Kantha concluded the memorandum by stating: "This unequal distribution of power is evident by the fact that Commissioner Blue has made major agency decisions without having included his *TWO TOP EXECUTIVE FEMALES* in any planning or decision making processes." *Id.* (emphasis in original).

Kantha followed her July 24 memorandum with two memoranda—one sent to Chicatelli and carbon copied to Natoli and Howard, and one sent to Blue—dated August 1, 2000. [Nicaj Affirmation, Ex. 23, 28]. The memoranda were virtually identical and both stated that Kantha was relegated to a confined space outside the executive suite that was "wholly inadequate for the Division of Regional Affairs and all that this position encompasses." *Id.* Kantha also wrote (in both memoranda) that a door Blue had directed to be built "served to effectively shut me out of the executive chain of command." *Id.*

### C. *Alleged Retaliation by Defendant Blue*

Plaintiff alleges that Blue took the following actions toward her in retaliation for the complaints she made about his behavior:

### Staff Meeting Incident

Plaintiff testified that in June of 2000 Blue looked straight at her at a meeting and told her "there would be changes." [Plaintiff's 56.1 Statement ¶ 25; Nicaj Affirmation, Ex. 4, at 211]. She also testified that he made "all kinds of threats." *Id.*

### Negative Performance Evaluations

In an evaluation dated April 7, 2000, Blue set forth four main critiques of Kantha's job performance. [Plaintiff's 56.1 Statement ¶ 25; Nicaj Affirmation, Ex. 41]. He rated her performance as "unsatisfactory," the lowest rating possible. *Id.*

Blue performed another evaluation, dated June 30, 2000, in which he again set forth the four main critiques and expanded on them. [Plaintiff's 56.1 Statement ¶ 25; Nicaj Affirmation, Ex. 29]. He also gave her the same "unsatisfactory" performance rating.

### Unwarranted Complaints About Plaintiff's Absences

In a July 13, 2000 memorandum, Blue admonished Kantha for being absent from the office on two days (July 7, 2000 and July 10, 2000) without approval, and for missing an executive staff meeting on July 10. [Plaintiff's 56.1 Statement ¶ 25; Nicaj Affirmation, Ex. 32] Blue warned plaintiff that she would "be subject to further probation and possible disciplinary action" if she did not improve her performance within ten days from the date of the memo. *Id.*

Kantha responded to Blue's criticisms in the space provided on the memorandum. She claimed that her secretary had informed Blue of her absences—one to attend a meeting at the White Plains office and one to attend the Governor's signing of the Hate Crime Bill. *Id.* She also stated: "I am saddened by the fact, that you continue to harass me on all levels, *for the record let me state and respond to your unprofessional approach in dealing with women administrators and your need to*

*control and oppress."* *Id.* (emphasis in original).

### Requiring Plaintiff to Get Permission to Visit Regional Offices

Plaintiff testified that Blue required her to get his permission in order to visit the Division's regional offices. [Plaintiff's 56.1 Statement ¶ 25; Nicaj Affirmation, Ex. 4, at 90–91]. She claims that Blue required her to take personal time whenever she was out of the office during her job. *Id.*

### Failure to Provide Plaintiff with an Office in the Executive Suite

Plaintiff testified that she was supposed to receive office space in the executive suite at the Division's offices in the Bronx. [Plaintiff's 56.1 Statement ¶ 26; Nicaj Affirmation, Ex. 22, 23, 28, Ex. 4 at 177–78]. But Blue did not provide plaintiff with an office in the executive suite. Rather, he provided her with a much smaller office next to the executive suite and put up a wall and door to separate the two areas. *Id.*

### D. Alleged Retaliation by Defendant Tolbert

On August 16, 2000, a few days after moving into the new offices in the Bronx, Blue announced that it would be his last day. [Plaintiff's 56.1 Statement ¶ 27; Nicaj Affirmation, Ex. 40]. Tolbert was appointed as Acting Commissioner the next day. [Plaintiff's 56.1 Statement ¶ 28; Nicaj Affirmation, Ex. 6, at 6].

On September 29, 2000, Tolbert terminated Kantha's employment at the Division. [Plaintiff's 56.1 Statement ¶ 31]. Kantha testified that Tolbert said she (Tolbert) did not have the authority to fire anyone at the Division and needed approval from the Governor's office. [Plaintiff's 56.1 Statement ¶ 33; Nicaj Affirmation, Ex. 4, at 465–66]. As a result, plaintiff contends that State Operations told Tolbert to terminate Kantha's employment. [Plaintiff's 56.1 Statement ¶¶ 32–34].

## II. Discussion

### A. Plaintiff's First Amendment Retaliation Claims

Kantha argues that defendants Blue and Tolbert targeted her for adverse employment action in violation of her right to free speech under the First Amendment. To prevail on a First Amendment retaliation claim, a public employee must establish that (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) there was a causal connection between the speech and the adverse employment action. *See Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir.2003). If a plaintiff produces evidence of these three elements, a defendant may escape liability on either of two separate rationales. First, the defendant "may show that plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was 'sufficient to outweigh the First Amendment value of plaintiff's speech.'" *Id.* (quoting *Locurto*, 264 F.3d at 166). Second, the defendant may prevail "by demonstrating by a preponderance of the evidence that [he] would have taken the same adverse action in the absence of the protected speech." *Id.* (citing *Morris*, 196 F.3d at 110).

### 1. Plaintiff's Speech Addressed a Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). More specifically, speech will be considered to address a matter of public concern if it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. Speech pertaining to internal personnel

disputes and working conditions is generally held not to involve matters of public concern. *Id.* at 147, 103 S.Ct. 1684 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

■■■ The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community. *Rao v. New York City Health & Hospitals Corp.,* 905 F.Supp. 1236, 1243 (S.D.N.Y.1995). Thus, a court must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen,* 165 F.3d at 163–64. Whether particular speech addresses a matter of public concern is a question of law for a court to decide. *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999).

Pursuant to these principles, courts in this Circuit and elsewhere have held that complaints of race and gender discrimination do not address matters of public concern if they relate only to a personal employment grievance. *See Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 143 (2d Cir.1993) (finding that employee's complaints of sex discrimination did not implicate matters of public concern because they "were motivated by and dealt with her individual employment situation"); *Walker v. New York City Transit Auth.,* No. 99 Civ. 2227, 2001 WL 1098022, at *12 (S.D.N.Y. Sept. 19, 2001) (rejecting the argument that all complaints relating to race or gender discrimination implicate matters of public concern); *Nonnenmann*

*v. City of New York,* 174 F.Supp.2d 121, 135–36 (S.D.N.Y.2001) (finding that police officer's testimony on behalf of a female, black co-worker in discrimination case was not a matter of public concern because it related to one individual's employment situation); *Menes v. CUNY,* 92 F.Supp.2d 294, 309 (S.D.N.Y.2000); *de Silva v. New York City Transit Auth.,* 1999 WL 1288683, at *17 (E.D.N.Y. Nov. 17, 1999) (citations omitted) ("[A]n EEOC complaint based on race and sex discrimination is not a matter of public concern, and therefore, is not protected speech under the First Amendment."); *see also Morgan v. Ford,* 6 F.3d 750, 754–55 (11th Cir.1993) (holding that female employee's complaints of sex harassment were designed to improve her own working conditions, rather than to raise issues of public concern).

■ In contrast, complaints concerning gender discrimination are protected if the employee "wanted to debate issues of sex discrimination," she sought "relief against pervasive or systemic misconduct by a public agency or public officials," or her speech was "part of an overall effort ... to correct allegedly unlawful practices or bring them to public attention." *Yatvin v. Madison Metro. School Dist.,* 840 F.2d 412, 420 (7th Cir.1988), *quoted in Saulpaugh,* 4 F.3d at 143; *see also Brennan v. Straub,* 246 F.Supp.2d 360, 366 (S.D.N.Y. 2003) (denying motion to dismiss because plaintiff's testimony on behalf of another female employee might not solely relate to plaintiff's own personal concern); *McGrath v. Nassau Health Care Corp.,* 217 F.Supp.2d 319, 328 (E.D.N.Y.2002) (denying motion to dismiss because plaintiff may have complained to officials about supervisor's sexual harassment of co-worker); *Wise v. New York City Police Dep't,* 928 F.Supp. 355, 372 (S.D.N.Y.1996) (denying summary judgment because there was a disputed issue of fact as to what plaintiff

said); *Domenech v. City of New York,* 919 F.Supp. 702, 707 (S.D.N.Y.1996) (finding that speech may be protected where plaintiff complained that three other women were treated similarly).

Many of Kantha's statements related to her individual employment situation. In her December 23, 1999 memorandum to Blue, for example, she complained of his "disregard for *my* position as Deputy Commissioner" and that had "undermine[d] *my* authority." [Nicaj Affirmation, Ex. 14] (emphasis added).

Only three memoranda are couched specifically in terms of gender discrimination. The first— May 15, 2000 memorandum in which Kantha told Blue that she would "no longer tolerate your abuse and sexist remarks"—relates only to her individual employment situation.

■■■ Two of Kantha's memoranda, however, appear to address pervasive or systemic misconduct by a public official (Blue). In her June 29, 2000 memorandum, Kantha complained that Blue had created a hostile work environment for all employees at the Division; that he had "no professional communication with any of his female executives"; that he had "developed a serious pattern of excluding all his female executives from planning," as evidenced by his treatment of Margaret King; and that he had sent a "young male" to represent the Division at an event when he knew that she and King were attending. In her July 24, 2000 memorandum, Kantha complained that Blue had assigned four male executives (three of whom where subordinate to her in the Division's hierarchy) and only one female executive to the executive suite in the Division's new office space. She also once again complained that Blue's exclusion of his "two top female executives" from decisionmaking processes evidenced an "unequal distribution of power." It does not matter that these two memoranda also addressed Kantha's indi-

vidual employment situation, because "*Connick* precludes First Amendment protection for public employees when they speak 'upon matters *only* of personal interest.'" *Lewis v. Cowen,* 165 F.3d 154 (2d Cir.1999) (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684) (emphasis in *Lewis v. Cowen* ).

This case is similar to *Domenech v. City of New York,* 919 F.Supp. 702, 707 (S.D.N.Y.1996). There, the plaintiff filed a complaint with the New York Police Department's Office of Equal Employment Opportunity, claiming that she had been discriminated against on the basis of her sex when a superior officer disciplined her for improperly taking a day off. In her complaint, the plaintiff alleged that three other women in her precinct had been similarly disciplined, while no males had been. *Id.* at 704–05. Judge Sweet concluded:

> At the summary judgment stage, Domenech's complaints cannot be held to have been motivated solely by the conditions of her individual employment situation. In complaining about her treatment by fellow officers, Domenech explicitly claimed that she was discriminated against on the basis of her sex and informed the OEEO that three other women in her precinct had been similarly treated.

*Id.* at 707. Here, Kantha complained that Blue had discriminated against her on the basis of her sex and informed people at State Operations that Blue had treated other women at the Division similarly. I decline to grant summary judgment on the basis that Kantha's speech did not address a matter of public concern.

### 2. *Adverse Employment Action*

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and rep-

rimand." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). In addition, plaintiff may show that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002).

■ At the very least, Blue's July 30, 2000 negative evaluation, his July 13, 2000 reprimand, and plaintiff's ultimate termination by Tolbert constitute adverse employment actions. I therefore decline to address whether plaintiff's other allegations also rise to the level of an adverse employment action under the standard articulated in *Phillips v. Bowen.*

### 3. Causation

■ To show a causal connection, there must be sufficient evidence to support an inference that the protected speech was "a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris,* 196 F.3d at 110. "Causation can be established either indirectly by means of circumstantial evidence, . . . or directly by evidence of retaliatory animus." *Id.* (citing *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)).

■ Circumstantial evidence of causation may include the timing of a defendant's conduct, such as when an adverse employment action follows closely in time a plaintiff's protected speech. *See Gorman–Bakos v. Cornell Cooperative Extension of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir.2001); *Scheiner v. New York City Health & Hospitals,* 152 F.Supp.2d 487, 496 (S.D.N.Y.2001). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship between the exercise of a federal constitutional right and allegedly retaliatory action." *Gorman–Bakos,* 252 F.3d at 554. But the Court of Appeals has found that a period of eight months separating a plaintiff's complaint and the retaliatory action can support a causal relationship. *See Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980).

### a. Defendant Blue

■ Plaintiff's direct evidence of retaliatory animus concerns an occurrence at a meeting that Blue and Kantha both attended. Plaintiff's complaint states that Blue "[d]emand[ed] of her that complaints concerning him be brought directly to him, threatening that if they were not, 'there would be changes.'" [Felix Declaration, Ex. 1, at 10(a)]. When asked about this allegation during her deposition, Kantha testified: "That was in June when he told me that he—he looked straight at me and told me at that meeting that there would be changes, he was making all kinds of threats." [Nicaj Affirmation, Ex. 4, at 211]. It is not clear from the record before me whether the meeting occurred on or after June 29, but interpreted most favorably to plaintiff there is evidence in the record to suggest that Blue was motivated by retaliatory animus.

In addition, there is a strong temporal relationship between plaintiff's protected speech and at least two adverse employment actions. Plaintiff's incidents of protected speech occurred on June 29 and July 24, 2000. Blue gave Kantha a negative evaluation dated June 30, and Blue reprimanded Kantha in a memoranda dated July 13, 2000—both shortly after her June 29 memorandum.

■ In this Circuit, there are circumstances where temporal proximity, standing alone, is not sufficient to support causation. For example, "[w]here timing is

the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir.2001). Blue gave Kantha a negative evaluation and reprimanded her well before she engaged in protected speech—April 7, 2000 and December 23, 1999, respectively. But the temporal relationship, combined with the direct evidence of retaliatory animus (thin as it might be), creates a genuine issue of material fact with regard to causation.

### b. *Defendant Tolbert*

■ Although direct evidence precludes summary judgment on the basis of causation as to defendant Blue, no such evidence exists in the record with respect to defendant Tolbert. Thus, the principle enunciated in *Slattery* applies. Kantha received negative evaluations of her work beginning in December of 1999, so the temporal proximity of her June and July 2000 memoranda and her termination, without more, does not adequately support plaintiff's contention that her termination by Tolbert was motivated by her protected speech. I therefore turn to the record to see if there is additional evidence to support Kantha's charge that Tolbert participated in a retaliatory scheme.

As noted at the beginning of this opinion, the specific claim asserted by plaintiff against Tolbert is that she agreed with unnamed individuals in State Operations to terminate Kantha in order to receive the Commissioner's job. After discovery, plaintiff argues that individuals in State Operations—specifically, Natoli, Howard, and/or Chicatelli (she does not say who)— advised Tolbert to terminate her. She contends that this establishes the causal nexus between her protected speech and her termination. [Plaintiff's Memorandum in Opposition to Summary Judgment 16].

There is absolutely nothing in the record to support plaintiff's original contention (made by counsel at a pre-trial conference) that Tolbert had to promise to fire Kantha in order to get her job as Acting Commissioner of the Division. Moreover, there is no evidence in the record before me that anyone in State Operations told Tolbert to fire plaintiff (which may be why none of the "Doe" defendants has yet been named and served). The only evidence plaintiff offers to support this contention is evidence suggesting that Tolbert did not have the authority to terminate her without input from State Operations. Kantha testified, for example, that Tolbert told plaintiff that she needed approval from the Governor's office to fire anyone.

■ This evidence is not sufficient to defeat Tolbert's motion for summary judgment. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir.2001) (internal citations omitted). One way of demonstrating "personal involvement" is by showing that Tolbert personally participated in the alleged constitutional violation *with knowledge of the facts that rendered the conduct illegal. Id.* at 155.

Tolbert certainly "participated" in the alleged misconduct, in that she fired Kantha. And Tolbert also acknowledged that Kantha openly expressed her unhappiness with Blue—as she put it, "There was no secret within the agency that Commissioner Kantha was upset with Commissioner Blue." [Nicaj Aff. Ex. 6, at 224–25]. Indeed, Kantha told Tolbert that she intended to write memos to Albany about Blue. *Id.* But there is not a scintilla of evidence in the record that Tolbert knew that someone in State Operations wanted her to fire plaintiff because of her allegations that

Blue discriminated against women employees at the Division. Plaintiff's allegations to that effect are completely speculative and do not establish a genuine issue of material fact.

As a result, the evidence before the court is insufficient to send plaintiff's retaliation claim against Tolbert to a jury.

### 4. *Pickering Balancing Test*

In *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court established a balancing test for determining when a public employer may discipline an employee for exercising the right to free expression. The *Pickering* test requires a balancing of the employee's First Amendment right to free expression against a public employer's interest in providing "effective and efficient" public services. *Lewis v. Cowen*, 165 F.3d at 162. And "it is the court's task to apply the [balancing test] to the facts." *Id.* at 164 (quoting *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)) (internal quotation marks omitted).

 In weighing the employer's interest, a court must consider at least three factors. First, a court must determine "whether the statement sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891; 97 L.Ed.2d 315 (1987)). Second, the manner, time, and place in which the speech occurs is important. "For example, the *Pickering* balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers." *Id.* (citing *Connick*,

461 U.S. at 152–53 n. 13, 103 S.Ct. 1684). Third, a court must consider the nature of the employee's responsibilities. "[T]he more the employee's job required confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997), *quoted in Lewis v. Cowen*, 165 F.3d at 162.

 In weighing an employee's speech, a court must look to its content— "[t]he more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Id.* Overall, the government bears the burden of demonstrating that the speech threatens to interfere with government operations. *Mandell*, 316 F.3d at 384–85.

 I find that, for purposes of this motion for summary judgment, Blue has failed to sustain his burden of showing that Kantha's speech sufficiently threatened to interfere with the Division's operation to outweigh plaintiff's First Amendment rights. It does appear that Kantha's complaints impacted harmony among co-workers and had a detrimental impact on close working relationships. She directed her complaints about pervasive gender discrimination to the Governor's office, however, not to others within the Division. And although Kantha's job required policymaking and public contact, those factors weigh more heavily when the employee engages in public speech. *See Pappas v. Giuliani*, 290 F.3d 143, 149 (2d Cir.2002). Here, Kantha complained internally.

As described above, Kantha's speech addressed a matter of public concern because it involved allegations of systemic gender discrimination by the Division's Commissioner. In weighing Kantha's speech in the context of the *Pickering* balancing test, I find two factors particularly impor-

tant. First, Kantha complained of pervasive gender discrimination by the person charged with heading the Division. Second, the Division's duty is to address discrimination in the state of New York. The fact that plaintiff's speech alleged discrimination by the head of the very agency that is supposed to prevent or remedy discrimination in New York counsels weighing plaintiff's speech more heavily.

5. *Blue is not Entitled to Summary Judgment on the Basis of Qualified Immunity*

Blue argues that he is entitled to qualified immunity as a matter of law.[2] The qualified immunity doctrine shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the objective reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir.1993).

To determine whether a right was clearly established, a court must consider "(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question;

and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991). The proper question in this case is whether Blue should have known that reprimanding Kantha and giving her negative work evaluations because she complained about his systemic discrimination against female Division employees would violate the First Amendment. *Cf. Lewis v. Cowen,* 165 F.3d at 167. "For over 30 years the Supreme Court has consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto v. Safir,* 264 F.3d 154, 166 (2d Cir.2001). And the Second Circuit more specifically addressed complaints regarding gender discrimination in *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d at 143.

In addition, "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto,* 264 F.3d at 169. This case is similar to *Mandell v. County of Suffolk,* 316 F.3d 368 (2d Cir.2003). There, the plaintiff alleged that the Suffolk County Police Department and its police commissioner retaliated against him because he complained of pro-Catholic and anti-Jewish bias at the police department. *Id.* at 374–75. The Court found that the plaintiff had submitted enough proof to support a finding that his criticisms motivated the police commissioner's

---

**2.** Defendant Tolbert also argues that she is entitled to summary judgment on qualified immunity grounds. I need not reach this issue because plaintiff has not offered evidence to support her retaliation claim against Tolbert.

promotion and transfer decisions. *Id.* at 384. As a result, the Court ruled:

Where the specific intent of a defendant, is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate. In the present case retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against defendant [police commissioner] cannot be dismissed on qualified immunity grounds.

*Id.* at 385. Here, there is a triable issue of fact as to whether retaliatory animus motivated Blue's conduct toward plaintiff. I therefore cannot dismiss plaintiff's claim on qualified immunity grounds.

### B. *Plaintiff's Fourteenth Amendment Claim*

Kantha argues that Blue violated her rights under the Equal Protection Clause of the Fourteenth Amendment when he "treated [her] differently by reason of her gender and in retaliation for having exercised her First Amendment right to speech." [Plaintiff's Memorandum in Opposition 15]. It is not clear whether Kantha bases this claim on "disparate treatment" because of her gender or "selective enforcement" because of either her gender or speech. She only cites cases regarding selective enforcement, but her allegations appear also to support a disparate treatment claim. I therefore address both.

### 1. *Speech–Based Equal Protection Claim*

 Plaintiff alleges that Blue treated her differently from others because she expressed concern about his con-

duct toward female employees at the Division. In order to succeed on a claim of selective enforcement, a plaintiff must prove that "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980)); *see also La-Trieste Restaurant & Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994); *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992).

 It is possible, at least in theory, for an employer's adverse treatment of an employee, because of that employee's speech, to constitute selective enforcement in violation of the Equal Protection Clause. *See, e.g., Knight v. Connecticut Dep't of Public Health,* 275 F.3d 156, 166 (2d Cir. 2001) (plaintiff claiming selective enforcement where they were disciplined because of their speech); *Birmingham v. Ogden,* 70 F.Supp.2d 353, 371–72 (S.D.N.Y.1999) (plaintiff claiming he was singled out for discipline because he criticized political cronyism at the police department). But it is necessary for a plaintiff making such a claim to put forward some evidence that he was treated differently from others who were similarly situated. In *Knight,* for example, the Second Circuit upheld the district court's dismissal of plaintiffs' equal protection claim because they failed to provide "evidence to show they were treated differently than other similarly situated employees." 275 F.3d at 166. Here, Kantha fails to provide any evidence to suggest that other similarly situated employees, who did not complain about Blue's conduct, were treated differently. Thus, plaintiff's

equal protection claim cannot proceed insofar as she alleges speech-motivated selective enforcement.

### 2. Gender–Based Equal Protection Claim

The Supreme Court has declared that "individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment." *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir.1994) (citing *Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)). A plaintiff bringing suit for disparate treatment under the Equal Protection Clause must demonstrate purposeful discrimination. *See Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 161–62 (2d Cir.1981). In other words, proof of "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development, Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *quoted in Silver v. City University of New York*, 947 F.2d 1021, 1022–23 (2d Cir.1991); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 269, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("[W]here a public employee brings a 'disparate treatment' claim under 42 U.S.C. § 1983 and the Equal Protection Clause the employee is entitled to the favorable evidentiary framework of *Arlington Heights*.").

Thus, in order to survive a motion for summary judgment on an equal protection claim, a plaintiff must come forward with some credible evidence that the defendant's actions were motivated by gender-based animus or ill-will. *See Grillo v. New York City Transit Authority*, 291 F.3d 231, 234 (2d Cir.2002). " 'Discriminatory purpose' . . . implies . . . that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Such discriminatory motive can "be inferred from the mere fact of differences in treatment." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citing *Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. 555); *see also Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir.1998) ("An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees, thus suffering 'disparate treatment because of gender.' ").

Here, plaintiff offers evidence that Blue excluded female Division employees (in particular Tolbert and Kantha) from decision making processes and delegated their responsibilities to male employees. There is also evidence that Blue worked well with those male employees, but not with Tolbert or Kantha. In addition, Kantha testified that Blue yelled at female employees, but that she never saw him yell at male employees. This evidence tends to establish that Blue treated her (and other female employees) differently from similarly situated male employees. As a result, a genuine issue of material fact exists for trial. *See Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir.2001) (explaining that whether two individuals are similarly situated is typically an issue for a jury to determine).

### 3. Blue is Not Entitled to Qualified Immunity

"The Supreme Court declared [twenty four] years ago that individuals have a constitutional right under the equal protection clause to be free from sex dis-

crimination in public employment." *Annis,* 36 F.3d at 254 (citing *Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)). And under the facts interpreted most favorably to plaintiff, it was not reasonable for Blue to adversely treat Kantha because she was a woman.

### C. *Plaintiff's State Law Claim*

██ Plaintiff also brings suit pursuant to Section 296(6) of the New York Human Rights Law, which makes it unlawful for "any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6). Under Second Circuit precedent, an individual defendant "who actually participates in the conduct giving rise to a discrimination claim" may be personally liable under 296(6). *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1319 (2d Cir.1995); *see also Perks v. Town of Huntington,* 96 F.Supp.2d 222, 228 (E.D.N.Y.2000) (noting that courts have expressed reservations about *Tomka* but that it remains the law in the Second Circuit). However, "[i]t is the employer's participation in the discriminatory practice that serves as the predicate for the imposition of liability on others for aiding and abetting." *Murphy v. ERA United Realty,* 251 A.D.2d 469, 674 N.Y.S.2d 415, 417 (2d Dep't 1998); *see also DeWitt v. Lieberman,* 48 F.Supp.2d 280, 294 (S.D.N.Y. 1999); *Lewis v. Triborough Bridge & Tunnel Authority,* 77 F.Supp.2d 376, 382 n. 8 (S.D.N.Y.1999); *Duviella v. Counseling Service of Eastern Dist. of New York,* 2001 WL 1776158, at *18 (E.D.N.Y. Nov. 20, 2001).

██ Here, the state's sovereign immunity prevents Kantha from bringing suit against the Division as her employer. But cases where courts have ruled that a plaintiff's aiding and abetting claim against an employee may not proceed because they cannot proceed against an employer have dismissed the claims against the employer on the merits. *See, e.g., DeWitt,* 48 F.Supp.2d at 294 (dismissing plaintiff's aiding and abetting claim against a co-worker because plaintiff had not offered any proof that his employer had violated the Human Rights Law). As a result, I find those cases inapposite and decline to grant summary judgment on plaintiff's state law claim against Blue. *See Martin v. New York State Dep't of Correctional Services,* 224 F.Supp.2d 434, 442 (N.D.N.Y.2002) (denying summary judgment on aiding and abetting claim against individuals even though claims against state employer could not proceed because of sovereign immunity).

### III. *Conclusion*

For the reasons discussed above, defendant Blue's motion for summary judgment is denied. Defendant Tolbert's motion is granted and plaintiff's suit is dismissed as to her.

This is the decision and order of the Court.